**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| ANGELICA ALLISON, TYLER BAKER, HOLLY BARNES, KAMI BOUSCHER, MICHAEL CLANCY, JOSEPH DANSON, SHARON DAWSON-GREEN, MICHELLE FENDELANDER, TINA GRANT, LORA GRODNICK, RONDA LEE HAINES, CONNIE HARRISON, PAUL HAYASHINO, SARAH JURACICH, JEFFREY KAPLAN, REYNA KAPLAN, DAVID KENWARD, DERRICK KOEHN, AKSHAY MEHTA, GREGORY MOUNT, TAMOTU MULITAUAOPELE, JAMES O'CONNOR, PETE OLSON, KATHERINE REBICH, KASSIDY SCHMITZ, MELANIE SCOTT, MICHAEL SEGAL, VICTORIA SHAEV, DUSTIN SHAPIRO, DAVID SHOW, LISA SMITH, SEBASTIAN SZYLKOWSKI, ROBERT TAYLOR, SCOTT THOMPSON, JENNIFER THORNDYKE, and DOUGLAS YAREMA, individually and on behalf of all others similarly situated, | Case No. 3:26-cv-00702 **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| *Plaintiffs,* | |
| v. | |
| CAL-MAINE FOODS, INC., ROSE ACRE FARMS, INC., VERSOVA HOLDINGS, LLC, HILLANDALE FARMS OF PA., INC., HILLANDALE-GETTYSBURG, LLC, HILLANDALE FARMS EAST, INC., HILLANDALE FARMS, INC., DAYBREAK FOODS, INC., OPAL FOODS, LLC, URNER BARRY PUBLICATIONS, INC., and EGG CLEARINGHOUSE, INC., | |
| *Defendants.* | |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

JURISDICTION AND VENUE ................................................................................................2

PARTIES ...................................................................................................................................4

    I.      PLAINTIFFS ............................................................................................4

    II.     DEFENDANTS ........................................................................................13

          A.     Cal-Maine ...............................................................................13

          B.     Rose Acre.................................................................................14

          C.     Versova ...................................................................................15

          D.     Hillandale Farms.....................................................................16

          E.     Daybreak Foods ......................................................................17

          F.     Opal Foods...............................................................................17

          G.     Urner Barry .............................................................................19

          H.     Egg Clearinghouse .................................................................20

          I.     Unnamed Co-Conspirators and Other Non-Parties..................20

FACTUAL ALLEGATIONS ....................................................................................................22

    I.      The U.S. Egg Industry .............................................................................22

          A.     Egg Production and Supply Dynamics .....................................22

          B.     Commodity Shell Eggs Are Fungible .......................................24

          C.     Consolidation in the Egg Industry ...........................................26

          D.     How Shell Eggs Are Priced: The Urner Barry Benchmark and ECI .........29

    II.     Anticompetitive Conduct ........................................................................30

          A.     Defendants Conspire to Inflate the Price of Commodity Shell Eggs.........32

                1.     Defendants Coordinated Bidding and Reporting Practices to Manipulate the Urner Barry Benchmark.......................................32

                     (i)     Executing Premium Trades to Give Urner Barry Reporters Something "To Hang [Their] Hat On" ..............32

                     (ii)    Coordinating the Timing, Volume, and Direction of Bids to Push or Hold the Benchmark ("Bidding Early and Often")............................................................................34

                     (iii)   Directly Lobbying and Pressuring Urner Barry Personnel...............................................................................36

                2.     Defendants Used HPAI as a Pretext and Deliberately Slowed Flock Recovery to Sustain an Artificial Supply Shortage ............37

B. The Historically High Price of Commodity Shell Eggs Cannot be Explained by Market Forces .................................................................40

1. The sharp rise in egg prices since 2022 cannot be explained by Avian Flu .......................................................................41

2. There were no material constraints to rebuilding flocks and production capacity .........................................................45

3. Input costs do not explain Shell Egg price increases .....................46

4. Defendants' Financial Records Confirm Price Increases Were Not Cost-Driven .................................................................48

5. The sharp decrease in prices following the DOJ's announcement of its investigation indicates that the price of shell eggs was not driven by market forces ...................................50

C. Plus Factors Corroborate Defendants' Conspiracy ...................................51

1. A Government Investigation and Enforcement Action Targeting the Conduct Alleged in this Complaint ........................52

2. Defendants Acted Against Their Unilateral Economic Self-Interest.................................................................52

3. Some of the Egg Producer Defendants are recidivist conspirators ......................................................................53

4. Defendants Have a Common Motive..............................................54

5. Commodity Shell Eggs Are Fungible .............................................54

6. Commodity Shell Eggs Have Inelastic Demand.............................55

7. Defendants Have Numerous Opportunities to Collude .................56

8. High Barriers to Entry Protect the Conspiracy from Competitive Discipline .................................................................57

DEFENDANTS ARE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS ................58

TOLLING OF STATUTE OF LIMITATIONS ..............................................................59

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT...........................................60

CLASS ACTION ALLEGATIONS ...............................................................................62

CLAIMS FOR RELIEF ...............................................................................................66

PRAYER FOR RELIEF ............................................................................................104

DEMAND FOR JURY TRIAL ...................................................................................106

This is a class action complaint brought on behalf of thirty-six consumer indirect purchaser plaintiffs ahead of the July 31, 2026 filing of the Consumer Indirect Purchaser Plaintiffs' consolidated complaint in *In re: Shell Eggs Antitrust Litigation*, No. 3:26-md-03175-jdp, MDL No. 3175 (W.D. Wis.). Once filed, the Consumer Indirect Purchaser Plaintiffs' consolidated complaint will serve as the operative complaint for the Plaintiffs named in this pleading.

Plaintiffs Angelica Allison, Tyler Baker, Holly Barnes, Kami Bouscher, Michael Clancy, Joseph Danson, Sharon Dawson-Green, Michelle Fendelander, Tina Grant, Lora Grodnick, Ronda Lee Haines, Connie Harrison, Paul Hayashino, Sarah Juracich, Jeffrey Kaplan, Reyna Kaplan, David Kenward, Derrick Koehn, Akshay Mehta, Gregory Mount, Tamotu Mulitauaopele, James O'Connor, Pete Olson, Katherine Rebich, Kassidy Schmitz, Melanie Scott, Michael Segal, Victoria Shaev, Dustin Shapiro, David Show, Lisa Smith, Sebastian Szylkowski, Robert Taylor, Scott Thompson, Jennifer Thorndyke, and Douglas Yarema bring this action for damages and injunctive relief individually and on behalf of proposed classes of consumer indirect purchasers of Commodity Shell Eggs against Defendants Cal-Maine Foods, Inc., Rose Acre Farms, Inc., Versova Holdings, LLC, Hillandale Farms of PA., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc., Hillandale Farms, Inc., Daybreak Foods, Inc., and Opal Foods, LLC (collectively, the "Egg Producer Defendants" or "Producer Defendants"); Urner Barry Publications, Inc.; and Egg Clearinghouse, Inc. for violations of: (1) the antitrust laws of the United States; and (2) the antitrust and consumer protection laws of the states set forth in this complaint.

## INTRODUCTION

1. This is an antitrust case arising out of concerted anticompetitive behavior by some of the largest egg producers in the United States. For approximately four years, these producers exploited unique structural aspects of the United States egg industry—including a privately-set

1

benchmark used to price nearly every wholesale egg transaction in the U.S.; outsized control over supply by a small handful of vertically-integrated producers; and commercial interconnections between and among producers and trading platforms—to manipulate and inflate the price of conventional and cage-free shell eggs (hereinafter, "Commodity Shell Eggs" or "Shell Eggs") across the country.

2. This action is brought to recover for the anticompetitive overcharge caused by the conspiracy set forth in this complaint, and to remedy the conduct that led to it. Plaintiffs and the proposed classes purchased Commodity Shell Eggs at prices inflated by the actions of the defendants and their co-conspirators, and will continue to purchase Commodity Shell Eggs in the future. They seek through this litigation to recover the damages Defendants' unlawful conduct caused, and to enjoin Defendants from resuming and/or continuing their anticompetitive conduct in the future.

**JURISDICTION AND VENUE**

3. This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and the antitrust and unfair competition laws of several states. Plaintiffs' Sherman Act claim seeks injunctive relief, costs of suit, and reasonable attorneys' fees, and the state law claims seek injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees.

4. This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

5. This Court has personal jurisdiction over all Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391, as well as under relevant state law.

6. Defendants' unlawful, anticompetitive conduct substantially affected interstate

commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class Members.

7.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

8.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (1) transacted business throughout the United States, including in this District; (2) manufactured, sold, shipped, and/or delivered substantial quantities of Commodity Shell Eggs throughout the United States, including this District; (3) had substantial contacts with the United States, including this District; and/or (4) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

9.    Defendants' conduct alleged here occurred within the flow of interstate commerce, including in this district, and was intended to and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

10.    During the period starting at least on January 1, 2022, until such time that the adverse effects of Defendants' anticompetitive conduct cease ("Class Period"), Defendants manufactured, sold, and shipped Commodity Shell Eggs in a continuous and uninterrupted flow of interstate commerce, which included sales of eggs in this district, advertisement of eggs in media in this District, and employment of personnel in this district. Defendants' conduct had and

continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this district.

11.     The Judicial Panel on Multidistrict Litigation previously held in its Transfer Order dated February 10, 2026, that this district "will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."[1]

**PARTIES**

**I.     PLAINTIFFS**

12.     Plaintiff Angelica Allison is a citizen of West Virginia. During the Class Period, Plaintiff Allison purchased Commodity Shell Eggs indirectly in West Virginia for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Allison paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Allison continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

13.     Plaintiff Tyler Baker is a citizen of Vermont. During the Class Period, Plaintiff Baker purchased Commodity Shell Eggs indirectly in Vermont for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Baker paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Baker continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

14.     Plaintiff Holly Barnes is a citizen of Arkansas. During the Class Period, Plaintiff Barnes purchased Commodity Shell Eggs indirectly in Arkansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Barnes paid prices for

---

[1] *In re: Shell Eggs Antitrust Litig.*, Case MDL No. 3175, Dkt. 80 at 1 (J.P.M.L. Feb. 10, 2026).

4

Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Barnes continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

15. Plaintiff Kami Bouscher is a citizen of Arkansas. During the Class Period, Plaintiff Bouscher purchased Commodity Shell Eggs indirectly in Arkansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Bouscher paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Bouscher continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

16. Plaintiff Michael Clancy is a citizen of Rhode Island. During the Class Period, Plaintiff Clancy purchased Commodity Shell Eggs indirectly in Rhode Island for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Clancy paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Clancy continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

17. Plaintiff Joseph Danson is a citizen of New York. During the Class Period, Plaintiff Danson purchased Commodity Shell Eggs indirectly in New York for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Danson paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Danson continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

18. Plaintiff Sharon Dawson-Green is a citizen of Missouri. During the Class Period, Plaintiff Dawson-Green purchased Commodity Shell Eggs indirectly in Missouri for non-

commercial use/consumption from Defendants or their co-conspirators. Plaintiff Dawson-Green paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Dawson-Green continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

19.    Plaintiff Michelle Fendelander is a citizen of Nevada. During the Class Period, Plaintiff Fendelander purchased Commodity Shell Eggs indirectly in Nevada for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Fendelander paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Fendelander continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

20.    Plaintiff Tina Grant is a citizen of Wisconsin. During the Class Period, Plaintiff Grant purchased Commodity Shell Eggs indirectly in Wisconsin for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Grant paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Grant continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

21.    Plaintiff Lora Grodnick is a citizen of New Jersey. During the Class Period, Plaintiff Grodnick purchased Commodity Shell Eggs indirectly in New Jersey for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Grodnick paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Grodnick continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

22.      Plaintiff Ronda Lee Haines is a citizen of Massachusetts. During the Class Period, Plaintiff Haines purchased Commodity Shell Eggs indirectly in Massachusetts for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Haines paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Haines continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

23.      Plaintiff Connie Harrison is a citizen of Tennessee. During the Class Period, Plaintiff Harrison purchased Commodity Shell Eggs indirectly in Tennessee for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Harrison paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Harrison continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

24.      Plaintiff Paul Hayashino is a citizen of South Dakota. During the Class Period, Plaintiff Hayashino purchased Commodity Shell Eggs indirectly in South Dakota for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Hayashino paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Hayashino continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

25.      Plaintiff Sarah Juracich is a citizen of Minnesota. During the Class Period, Plaintiff Juracich purchased Commodity Shell Eggs indirectly in Minnesota for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Juracich paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Juracich continues to suffer ongoing

7

injuries from Defendants' anticompetitive conduct described in this Complaint.

26. Plaintiff Jeffrey Kaplan is a citizen of Arizona. During the Class Period, Plaintiff Jeffrey Kaplan purchased Commodity Shell Eggs indirectly in Arizona for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Jeffrey Kaplan paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Jeffrey Kaplan continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

27. Plaintiff Reyna Kaplan is a citizen of Arizona. During the Class Period, Plaintiff Reyna Kaplan purchased Commodity Shell Eggs indirectly in Arizona for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Reyna Kaplan paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Reyna Kaplan continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

28. Plaintiff David Kenward is a citizen of North Carolina. During the Class Period, Plaintiff Kenward purchased Commodity Shell Eggs indirectly in North Carolina for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Kenward paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Kenward continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

29. Plaintiff Derrick Koehn is a citizen of Wisconsin. During the Class Period, Plaintiff Koehn purchased Commodity Shell Eggs indirectly in Wisconsin for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Koehn paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants'

8

anticompetitive conduct described in this Complaint. Plaintiff Koehn continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

30.     Plaintiff Akshay Mehta is a citizen of Oregon. During the Class Period, Plaintiff Mehta purchased Commodity Shell Eggs indirectly in Oregon for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Mehta paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Mehta continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

31.     Plaintiff Gregory Mount is a citizen of Kansas. During the Class Period, Plaintiff Mount purchased Commodity Shell Eggs indirectly in Kansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Mount paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Mount continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

32.     Plaintiff Tamotu Mulitauaopele is a citizen of Montana. During the Class Period, Plaintiff Mulitauaopele purchased Commodity Shell Eggs indirectly in Montana for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Mulitauaopele paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Mulitauaopele continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

33.     Plaintiff James O'Connor is a citizen of Michigan. During the Class Period, Plaintiff O'Connor purchased Commodity Shell Eggs indirectly in Michigan for non-commercial

9

use/consumption from Defendants or their co-conspirators. Plaintiff O'Connor paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff O'Connor continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

34. Plaintiff Pete Olson is a citizen of Kansas. During the Class Period, Plaintiff Olson purchased Commodity Shell Eggs indirectly in Kansas for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Olson paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Olson continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

35. Plaintiff Katherine Rebich is a citizen of North Carolina. During the Class Period, Plaintiff Rebich purchased Commodity Shell Eggs indirectly in North Carolina for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Rebich paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Rebich continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

36. Plaintiff Kassidy Schmitz is a citizen of Virginia. During the Class Period, Plaintiff Schmitz purchased Commodity Shell Eggs indirectly in Virginia for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Schmitz paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Schmitz continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

37. Plaintiff Melanie Scott is a citizen of Tennessee. During the Class Period, Plaintiff

Scott purchased Commodity Shell Eggs indirectly in Tennessee for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Scott paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Scott continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

38.     Plaintiff Michael Segal is a citizen of Washington, DC. During the Class Period, Plaintiff Segal purchased Commodity Shell Eggs indirectly in Washington, DC for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Segal paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Segal continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

39.     Plaintiff Victoria Shaev is a citizen of Florida. During the Class Period, Plaintiff Shaev purchased Commodity Shell Eggs indirectly in Florida for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Shaev paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Shaev continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

40.     Plaintiff Dustin Shapiro is a citizen of Michigan. During the Class Period, Plaintiff Shapiro purchased Commodity Shell Eggs indirectly in Michigan for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Shapiro paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Shapiro continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

41.     Plaintiff David Show is a citizen of Michigan. During the Class Period, Plaintiff Show purchased Commodity Shell Eggs indirectly in Michigan for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Show paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Show continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

42.     Plaintiff Lisa Smith is a citizen of Massachusetts. During the Class Period, Plaintiff Smith purchased Commodity Shell Eggs indirectly in Massachusetts for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Smith paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Smith continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

43.     Plaintiff Sebastian Szylkowski is a citizen of Florida. During the Class Period, Plaintiff Szylkowski purchased Commodity Shell Eggs indirectly in Florida for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Szylkowski paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Szylkowski continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

44.     Plaintiff Robert Taylor is a citizen of Connecticut. During the Class Period, Plaintiff Taylor purchased Commodity Shell Eggs indirectly in Connecticut for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Taylor paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Taylor continues to suffer ongoing

injuries from Defendants' anticompetitive conduct described in this Complaint.

45.    Plaintiff Scott Thompson is a citizen of Florida. During the Class Period, Plaintiff Thompson purchased Commodity Shell Eggs indirectly in Florida for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Thompson paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Thompson continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

46.    Plaintiff Jennifer Thorndyke is a citizen of Iowa. During the Class Period, Plaintiff Thorndyke purchased Commodity Shell Eggs indirectly in Iowa for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Thorndyke paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Thorndyke continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

47.    Plaintiff Douglas Yarema is a citizen of New York. During the Class Period, Plaintiff Yarema purchased Commodity Shell Eggs indirectly in New York for non-commercial use/consumption from Defendants or their co-conspirators. Plaintiff Yarema paid prices for Commodity Shell Eggs that were higher than they would have been absent Defendants' anticompetitive conduct described in this Complaint. Plaintiff Yarema continues to suffer ongoing injuries from Defendants' anticompetitive conduct described in this Complaint.

## II.    DEFENDANTS

### A.    Cal-Maine

48.    Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation with its principal place of business in Ridgeland, Mississippi. Cal-Maine is publicly traded under the ticker symbol CALM.

49.    Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Egg Farms to form Cal-Maine Foods. Since then, Cal-Maine has continued to aggressively acquire egg producers around the country. Cal-Maine has acquired and integrated nearly 30 companies to become the behemoth it is today. In 2024, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock.

50.    Cal-Maine is the largest producer of eggs in the United States. In 2024, Cal-Maine had over 50 million egg-laying hens, and it controlled approximately 20% of national egg sales. It is a fully integrated company with its operations consisting of hatching chicks, growing and maintaining chicken flocks, manufacturing feed, and producing, processing, packaging, and distributing shell eggs. In 2024, Cal-Maine achieved sales of $2.33 billion with over 1.15 billion dozen eggs sold.

51.    Cal-Maine has forty-nine egg production facilities in the United States, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

52.    During the Class Period, Cal-Maine subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

53.    During the Class Period, Cal-Maine sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**B.    Rose Acre**

54.    Defendant Rose Acre Farms, Inc. ("Rose Acre"), is an Indiana corporation with its principal place of business in Seymour, Indiana.

55.    Rose Acre is the second largest egg producer in the United States. As of 2024, it

14

had nearly 26 million egg-laying hens.

56.     Rose Acre has sixteen egg production facilities in the United States. These facilities are located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona.

57.     During the Class Period, Rose Acre subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

58.     During the Class Period, Rose Acre sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**C.      Versova**

59.     Defendant Versova Holdings, LLC, is a Delaware limited liability company with its principal place of business in Sioux Center, Iowa. Versova Holdings wholly or partially owns Trillium Farms, whose day-to-day operations are managed by Versova Management Cooperative. Through Centrum Valley Holdings and Versova Management Cooperative, Versova wholly or partially owns and manages day-to-day operations for egg-producing farms across the country, including Centrum Valley Farms, Oakdell Farms, and Willamette Egg Farms.

60.     This complaint refers to Versova Holdings, LLC and its owned, controlled, and/or affiliated entities collectively as "Versova."

61.     Versova is one of the largest egg producers in the United States. Versova has several egg production facilities in the United States, including five in Iowa. It also has facilities in Ohio, Washington, and Oregon. Versova farms include, among others, Center Fresh Group, Trillium Farms, Centrum Valley Egg Farms, and Willamette Egg Farms. In 2024, Versova and its family farms had over 35 million egg-laying hens.

62.     During the Class Period, Versova subscribed to Urner Barry, its commodity shell

15

egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

63.     During the Class Period, Versova sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**D.      Hillandale Farms**

64.     Defendant Hillandale Farms, Inc. is an Ohio corporation with its principal place of business in Gettysburg, Pennsylvania.

65.     Defendant Hillandale Farms of Pa., Inc. is a Pennsylvania corporation with its principal place of business in Gettysburg, Pennsylvania.

66.     Defendant Hillandale-Gettysburg, LLC is a Pennsylvania limited liability company with its principal place of business in Gettysburg, Pennsylvania.

67.     Defendant Hillandale Farms East, Inc. is a Pennsylvania corporation with its principal place of business in Gettysburg, Pennsylvania.

68.     Hillandale Farms, Inc., Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, and Hillandale Farms East, Inc., are all related entities, and this complaint refers to them collectively as "Hillandale Farms" or simply "Hillandale."

69.     Hillandale Farms is one of the largest egg producers in the United States. It produces approximately 38 million dozen eggs per month. In 2025, it had approximately 21 million egg-laying hens.

70.     Hillandale Farms has several egg production facilities in the United States, including in Pennsylvania and Ohio.

71.     Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion.

16

72. During the Class Period, Hillandale Farms subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

73. During the Class Period, Hillandale Farms sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

### E. Daybreak Foods

74. Defendant Daybreak Foods, Inc. ("Daybreak Foods," or simply "Daybreak"), is a Wisconsin corporation with its principal place of business in Lake Mills, Wisconsin.

75. Daybreak Foods is one of the largest egg producers in the United States. In 2025, Daybreak acquired S&R Egg Farm (which itself had 4.85 million egg-laying hens in 2024). It produces approximately 16 million eggs per day. In 2025, it had approximately 24 million egg-laying hens.

76. Daybreak operates several egg production and processing facilities in the United States, including in Wisconsin, Iowa, Illinois, Ohio, Minnesota, and Michigan.

77. During the Class Period, Daybreak Foods subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

78. During the Class Period, Daybreak Foods sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

### F. Opal Foods

79. Defendant Opal Foods LLC ("Opal Foods" or "Opal") is a Delaware limited liability company with its principal place of business in Neosho, Missouri.

80.    Opal Foods' operational history, with roots in Missouri, traces back to 1957, when Hollis Osborne founded MOARK Eggs, which ultimately became the third-largest producer of specialty and Commodity Shell Eggs in the United States. In 2000, Osborne merged the MOARK Eggs business with Land O'Lakes, and later sold his remaining ownership interest in 2005. In May 2014, MOARK's Midwest egg-production assets were sold to a newly formed entity known as Opal Foods, LLC.

81.    Opal Foods, LLC was formed by the agricultural investment firm AGR Partners, in strategic partnership with two established egg producers: Rose Acre Farms, Inc., based in Indiana, and Weaver Brothers, also known as Weaver Eggs, based in Ohio.

82.    In October 2020, Rose Acre Farms and Weaver Eggs acquired AGR Partners' full ownership interest, resulting in Opal being jointly owned by only Rose Acre and Weaver Eggs.

83.    Opal produces Commodity Shell Eggs. It is a franchisee of Eggland's Best, supplies Land O'Lakes All-Natural Brown Eggs, and was one of the eight original producer-members of ProEgg, an egg-farmer cooperative serving thirteen western states.

84.    Rose Acre and Weaver board designees jointly oversee Opal while both continue to produce and market eggs themselves. In fact, when Rose Acre and Weaver combined to purchase AGR Partners' interest in the business, Opal's board chair publicly framed the transaction as an alignment of Opal's culture "with the family business philosophy of its owners"—the Rust family (Rose Acre) and the Weaver family. Since then, Opal has been operated as a quasi-independent company with its own management team, while representatives of Rose Acre and Weaver "continue to serve on the Board and provide governance and oversight for the business."

85.    In March 2024, Opal Foods acquired the egg operations of Sparboe Farms. The merger united Opal's laying farms, pullet farms, feed mills, and processing operations in Missouri,

Colorado, and Iowa with Sparboe's shell-egg farms in Minnesota, Iowa, and Colorado.

86.     The merger combined Opal's flock of 7 million hens with Sparboe's 5 million hens for a total approximate flock size of 12 million.

87.     During the Class Period, Opal subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

88.     During the Class Period, Opal sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**G.     Urner Barry**

89.     Defendant Urner Barry Publications, Inc. is a New Jersey corporation with its principal place of business in Toms River, New Jersey. Urner Barry published egg prices to industry participants, including the Egg Producer Defendants, during the Class Period.

90.     Since 1976, Urner Barry has hosted an annual "Executive Conference" (originally in New Jersey, more recently in locales like Las Vegas), which is today the most widely attended and recognized marketing event in the poultry and egg industries.

91.     Urner Barry publishes its benchmark egg prices through an online database called Comtell On-Line ("Comtell"). Urner Barry claims that Comtell is "the most accessible, accurate and timely source for news, quotes and research" in the meat, poultry, pork, veal, seafood, and egg industries. Comtell subscribers "are updated several times a day on the most impactful market conditions."

92.     Urner Barry was previously a subsidiary of AgriBriefing Limited. In 2023, U.K.-based Mintec Group acquired AgriBriefing in a deal that included Urner Barry. Like Urner Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated

19

all of its operations under a single brand name: Expana.

### H.       Egg Clearinghouse

93.       Defendant Egg Clearinghouse, Inc. ("ECI"), is a Delaware corporation with its principal place of business located in Dover, New Hampshire.

94.       During the Class Period, ECI operated as an online spot market that allows participants to place bids on eggs listed for sale and see the results of trades.

95.       Only ECI members (*i.e.*, farmers and egg buyers) are allowed to trade on the ECI marketplace.

96.       In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more than $600 million, were traded on the ECI online platform.

97.       ECI represents just 5% of the shell egg market, but plays an outsized role in how eggs are priced nationwide, including through its direct impact on Urner Barry benchmark prices.

98.       ECI was a key tool used by conspirators to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices. ECI's structural vulnerabilities—designed into the market by its creators and managers, the nation's largest egg producers—assisted the conspirators in carrying out their anticompetitive scheme.

### I.       Unnamed Co-Conspirators and Other Non-Parties

99.       Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described in this complaint. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

100.      The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of

Defendants' businesses or affairs.

101.    Whenever reference is made in this complaint to any act of any corporation, company, association, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

102.    Each entity Defendant's agent operated under the authority and apparent authority of its respective principals.

103.    Each entity Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

104.    Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

105.    When this complaint refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant entities within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices of Commodity Shell Eggs.

106.    Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

21

**FACTUAL ALLEGATIONS**

I.    **The U.S. Egg Industry**

A.    **Egg Production and Supply Dynamics**

107.    Eggs are a fundamental staple in U.S. kitchens. The U.S. Department of Agriculture has recognized eggs as "among the most nutritious foods on earth." Similarly, the American Heart Association describes eggs as "an efficient, rich source of protein and vitamins" that supports healthy metabolism, liver function, and fetal brain development.

108.    Thanks to their high nutritional value and versatility in cooking, eggs remain an essential part of U.S. households. Both overall and per capita egg consumption have steadily risen over the past decades, with the average American estimated to consume approximately 273.6 eggs in 2026.

109.    The U.S. egg industry produces over 100 billion eggs each year. According to an industry analyst, the egg market in the United States is worth approximately $10 billion annually. The overwhelming majority of eggs produced—about 70 percent—are sold as whole "shell eggs" or "table eggs" at retail or food-service outlets; the remainder are broken and sold as liquid, frozen, or dried "egg products."

110.    Approximately 88 percent of shell eggs sold in the United States are either conventional or cage-free eggs—referred to in this complaint as "Commodity Shell Eggs" or simply "Shell Eggs"—and sold at prices benchmarked by a single, private firm, Urner Barry. These types of eggs, labeled with defined USDA sizes, grades, and colors, are sold as commodities and are priced daily by region by Urner Barry, in distinction to free-range and pasture-raised eggs, which are not indexed by Urner Barry. In some parts of the country, most notably California, all shell eggs must be "cage-free" by law, and Urner Barry's benchmark prices—which track California as a separate "cage-free" region—reflect this.

111. In shell egg markets, the chicken comes before the egg—a supply of specialized hens, and related poultry production facilities, is required for egg production. Poultry production starts with primary breeder flocks, whose eggs hatch into egg-laying hens (layers). Hens grow on pullet farms before moving to egg production facilities.

112. The egg production cycle is stable and predictable, which allows large producers to precisely calibrate future supply. Once a pullet is placed, her productive output follows a fixed biological trajectory: a flock begins producing eggs at 18 to 22 weeks of age, reaches peak production of approximately 90 percent at 30 to 32 weeks,[2] and declines to around 50 percent by 60 to 70 weeks. The majority of hens are removed from production between 100 and 130 weeks and replaced immediately by mature pullets, creating a continual cycle of renewal. Because this biological cycle is fixed and predictable, producers can forecast their future supply months in advance: reducing the number of pullets placed today predictably shrinks supply six to eight months later.

113. Producers also control the timing of supply through two additional levers. First, induced molting allows a producer to halt a flock's egg production for approximately 10 weeks at will, by withdrawing feed and controlling light exposure, after which the flock returns to production. Second, cold storage allows producers to hold packaged eggs for up to 45 days before shipment, withholding supply from the market when prices are low and releasing it when prices rise.

114. Eggs are produced nationwide, with most states contributing significantly. Production in the United States is concentrated in the Midwest. The top five egg producing states— Iowa, Ohio, Indiana, Pennsylvania, and Texas—represented approximately 42 percent of all laying

---

[2] That is, on any given day, approximately 90 out of 100 hens in the flock will lay an egg.

hens in 2024.

**B.    Commodity Shell Eggs Are Fungible**

115.    The overwhelming majority of shell eggs produced in the United States are either conventional or cage-free, sold as fungible commodities through retail or food service channels. These types of eggs account for approximately 88 percent of all shell eggs sold in the United States. They consist of standard white or brown eggs produced in non-specialty systems that comply with applicable hen housing requirements, whether conventional systems in most states or cage-free in states such as California. These eggs are sized and graded according to USDA-defined standards, are sold as baseline, Commodity Shell Eggs in retail and foodservice channels for a particular region, are priced by Urner Barry, and are overwhelmingly sold at prices based on an Urner Barry benchmark.

116.    In contrast, a smaller but expanding share of United States shell eggs consist of more specialized or "quality-differentiated types," including organic, free-range, and pasture-raised egg products. These non-commodity eggs represent a minority of total production but command higher prices due to their animal-welfare, environmental, or certification attributes. Commodity Shell Eggs remain the industry's core product and account for most U.S. egg sales.

117.    According to United Egg Producers ("UEP"), in 2025, over half of the eggs produced in the United States were sold as shell eggs through retail outlets, about 31% were processed into egg products, and almost 12% were sold through food service channels such as restaurants. Less than 2% of United States eggs produced in 2025 were exported.

24



118.     Conventional and cage-free shell eggs function as a classic commodity product because they are highly interchangeable. The U.S. government, through the U.S. Department of Agriculture ("USDA"), has established a uniform grading and sizing system. USDA Consumer Grades, such as Grade AA, Grade A, and Grade B, are based on specific interior and exterior quality factors. Similarly, sizes are standardized by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standards strip away most avenues for product differentiation. A "Grade A Large" egg from one producer is, for all practical purposes, identical to and perfectly substitutable with a "Grade A Large" egg from any other producer. Similarly, regional cage-free standards—principally California's—establish a standardized animal welfare baseline with which all eggs sold in the state must comply.

119.     As sellers of interchangeable commodity products subject to government-standardized size, grade, and color guidelines, Commodity Shell Egg producers compete almost entirely on price. Because government standards eliminate meaningful differences in quality or characteristics, producers have historically operated in a low-margin, volume-driven market. For

decades, the industry followed a predictable pattern: thin but stable profits, with little opportunity for any producer to command a premium.

120. However, in recent years, the United States egg market has undergone a structural overhaul. Producer consolidation, vertical integration of the largest producers, and economic interdependence through co-branding, joint ventures, and producer-to-producer trading have created a modern egg industry ripe for collusion. And the fact that nearly every commodity shell egg sold in the United States is priced by a single, private entity with a vulnerable pricing methodology created the means for such collusion to inflate egg prices nationwide.

121. That is what happened during the Class Period, which saw an abrupt and significant break from the traditional low-margin model as egg producers' profits skyrocketed alongside inflated prices—an outcome inconsistent with how a truly competitive commodity market should behave.

### C. Consolidation in the Egg Industry

122. Throughout most of the twentieth century the United States egg industry was highly fragmented, with thousands of independent farms. Since the 1980s, however, the industry has undergone aggressive consolidation. Between 1986 and 2002 the number of United States shell egg producers fell from 2,500 to just 700, and consequently the size of egg producing farms grew. In 1982 half of all egg-laying hens lived on farms with 62,000 hens or less, but by 2012 half of all egg-laying hens lived on farms with 925,000 hens or more. Then between 2012 and 2017, the egg industry consolidated even further as the number of egg farms fell by another 17 percent. More recently, and in 2023 alone, Cal-Maine acquired Fassio Egg Farms, Daybreak acquired Hen Haven LLC and Schipper Eggs LLC, and MPS Egg Farms (the sixth largest egg producer) acquired Country Charm.

123. Today, Cal-Maine, Rose Acre, Versova, Hillandale Farms, and Daybreak Foods

26

(referred to in the industry as the "Big Five") collectively control approximately half of all U.S. laying hens. Defendant Cal-Maine alone had over 50 million egg-laying hens in 2025, and it controlled approximately 20 percent of national egg sales. Industry analysts expect consolidation to continue. Indeed, in its investor presentations and earnings calls, Cal-Maine boasts of pursuing more acquisition strategies.

124. The larger of the Egg Producer Defendants are also vertically integrated—they own breeder flocks, operate multiplier and pullet farms, manufacture feed, run in-house grading and breaking facilities, and maintain dedicated trucking fleets.

125. In addition to its 50 million layers and forty-nine egg production facilities, Cal-Maine hatches the majority of its chicks in its own multiplier farms and grows them in its own pullet farms. When they reach egg-laying age, Cal-Maine transports them to its own production farms (~90%) or contracted farms (~10%), where they are given feed from Cal-Maine's own feed mills. After eggs are produced, Cal-Maine cleans, grades, and packages them at its own packing facilities for sale as shell eggs or breaks and transforms them into liquid, frozen, or dried form at its own processing facilities for sale as egg products. Finally, Cal-Maine prepares its table-eggs and egg products to be picked up by customers or ships them to customers' warehouses and retail stores with its own fleet of delivery trucks, or with contracted trucks.

126. Cal-Maine's vertical reach extends even further: it maintains its own 10 million-bird breeder program, giving it leverage over the replenishment stock needed by rivals that lack comparable breeding capacity. In a 2020 investor presentation, Cal-Maine touted that "[f]rom hatching to production, our facilities are capable of producing and processing 6.6 million eggs per hour." Defendant Rose Acre similarly maintains its own breeder flock. This vertical integration into pullet breeding means that Cal-Maine's and Rose Acre's decisions to slow-walk flock

restoration during the Class Period as detailed below were not constrained by pullet availability. Both had the physical capacity and the biological infrastructure to replenish their flocks at a competitive rate. Their failure to do so was a choice, not a compulsion.

127.    Moreover, independent producers without breeder flocks must source replacement pullets either from Cal-Maine and Rose Acre or from a two-firm genetics duopoly—Hendrix Genetics and EW Group—narrowing resupply options and creating a dependence among smaller producers upon the largest producers for the very existence and continuity of their business. This structure gives the dominant vertically integrated producers a structural advantage over their smaller competitors: when Cal-Maine and Rose Acre choose not to expand their own flocks, they simultaneously reduce the commercial pullet supply available to independent producers who depend on them as a source.

128.    As a result, smaller companies do not have the ability to rebuild their flocks as quickly as the most dominant firms, and when they do seek to rebuild their flocks, they may depend on Cal-Maine and Rose Acre for new additions.

129.    And vertical integration at the top of the U.S. egg industry creates economic reliance and interdependence among small producers in other ways as well. Because the vertically-integrated Big Five producers maintain large processing, packaging, transportation, storage, and trading components, smaller egg producers may rely on the largest producers to process their eggs, bring them to market, or even purchase them for resale to large wholesalers. Similarly, the largest producers engage in co-branding, joint ventures, and producer cooperatives with smaller producers across the country. As a result, an egg-producing cartel with a significant national market share (as in this case) has outsized influence against would-be mavericks or price-cutters even beyond the near-uniform dominance of the Urner Barry pricing benchmark.

130.    And even within layer egg stocks, egg producers can and do opportunistically control egg supply, including through induced molting.

**D.    How Shell Eggs Are Priced: The Urner Barry Benchmark and ECI**

131.    Because Shell Eggs are a commodity without a public, regulated exchange, virtually all wholesale pricing in the industry is anchored to a single source: the daily price quotations published by Defendant Urner Barry.

132.    Egg producers, including the Egg Producer Defendants, sell the substantial majority of their Commodity Shell Eggs to retailers, restaurants, and food service distributors under contracts that price eggs by reference to Urner Barry's daily quotations—either as the quotation itself or as the quotation plus or minus a fixed adjustment. Cal-Maine's SEC filings state that most conventional and cage-free shell eggs in U.S. retail and food service channels are priced based on quoted wholesale market prices like those from Urner Barry.

133.    Because these formula-priced contracts govern approximately 95 percent of the shell eggs sold in the United States, Urner Barry's daily quotations are, as the U.S. Department of Justice has put it, "an inseparable part of the price" that most retailers and other buyers pay for eggs. Therefore, even small movements in the daily Urner Barry quotation reprice billions of eggs already committed under existing contracts.

134.    Urner Barry is a price reporting agency that analyzes, aggregates, and anonymizes market information to publish daily price quotations for the egg industry. Urner Barry publishes these quotations across six U.S. regions—the Northeast, Southeast, Midwest, Northwest, California, and South Central—and across egg sizes such as Extra Large, Large, and Medium. Although published separately, Urner Barry's regional quotations are highly correlated, such that a change affecting one region typically affects the others.

135.    ECI supplies many of the trades, bids, and offers used by Urner Barry to determine

29

its benchmark prices. ECI is the sole organized spot market for shell eggs in the United States—a members-only electronic platform on which producers and buyers post offers, place (purportedly) blind bids, and execute trades, activity that ECI itself describes as the market's trading levels. Although ECI accounts for less than 5 percent of national shell egg transactions by volume, it is not a peripheral data point: Urner Barry explicitly incorporates ECI trade, bid, and offer data into its daily quotations, and ECI represents that its "trading levels . . . help determine prices on the wholesale level." A producer's bid, offer, or trade on ECI is therefore not simply a transaction between private parties; it is, by design, a direct input into the benchmark that governs nearly every other shell egg contract in the country.

136.   Urner Barry's methodology, while facially neutral, is structurally vulnerable to coordinated manipulation by a small number of dominant producers such as Egg Producer Defendants.

137.   Urner Barry's benchmark-setting mechanism is particularly vulnerable to sustained and coordinated manipulation by the industry's largest participants—and they have in fact manipulated that benchmark, injuring competition and raising egg prices, as explained below.

## II.     Anticompetitive Conduct

138.   For many years, the U.S. egg industry typically saw stable prices with mild fluctuations, but since consolidating in the 1980s and 1990s, it has become less cyclical and more rigid in production. During the course of the Class Period, Defendants broke the industry's longstanding pattern and increased egg prices to record highs, reaching $6.23 per dozen in March 2025 before an immediate collapse after a Department of Justice price-fixing investigation was revealed.

139.   Egg Producer Defendants claim HPAI outbreaks since late 2021 caused egg price increases, but the price inflation over the Class Period exceeds—in both magnitude and stability—

what bird flu losses alone would explain. Moreover, direct evidence now makes clear that the Class Period price inflation was indeed artificial—several of the nation's major egg producers conspired to manipulate commodity shell egg pricing benchmarks, leading to higher prices for retailers, restaurateurs, and consumers.

140.   The Defendants' conspiracy operated on two reinforcing tracks. The first track—coordinated manipulation of the Urner Barry benchmark through self-reporting and influence over ECI—was the primary engine of the price spike. Because approximately 95 percent of all shell egg contracts are pegged directly to the Urner Barry quotation, even modest artificial increases in reported prices cascade immediately and automatically into higher prices for nearly every downstream transaction.[3] The HPAI outbreak did not cause those inflated reports; Defendants used the outbreak as a pretext to justify benchmark prices that far exceeded what any genuine supply disruption could explain.

141.   The second track—coordinated output restriction—was the conspiracy's enforcement mechanism, but not its cause. In a competitive market, artificially elevated prices would attract new entry and additional supply, driving prices back toward competitive levels. The Egg Producer Defendants short-circuited that corrective force by collectively refraining from rebuilding flocks at the rate that competitive incentives and their own financial self-interest would otherwise demand. The supply restriction was not large enough to explain the price spike on its

---

[3] The existence of a benchmark pricing system does not immunize coordinated price fixing especially where, as here, competitors join efforts to influence the benchmark, raise prices in lockstep, and simultaneously take action to ensure the benchmark remains elevated. The Urner Barry price report itself was the mechanism for Defendants' collusion, allowing Defendants to jointly target supracompetitive prices. Courts have noted that benchmarks reliant on submission by industry participants are susceptible to coordinated influence and can be vehicles for price-fixing. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016). That is precisely what occurred among the Egg Producer Defendants during the Class Period.

own. But it was large enough, and sustained long enough, to prevent prices from self-correcting. In short: Defendants manufactured a story of scarcity to inflate the benchmark, and then made just enough of that scarcity real to keep prices from collapsing.

### A.    Defendants Conspire to Inflate the Price of Commodity Shell Eggs

#### 1.    Defendants Coordinated Bidding and Reporting Practices to Manipulate the Urner Barry Benchmark

142.    The Urner Barry benchmark heavily relies on a small number of dominant producers' self-reported bids, trades, and market "assessments," filtered through the subjective judgment of a handful of Urner Barry reporters and editors and anchored day-to-day to the prior day's quotation. This structure gave the Egg Producer Defendants both the means and the opportunity to move the national egg benchmark using a common and repeated playbook: agreeing that multiple producers would bid so that a diverse set of market participants appeared to be driving the market; agreeing to submit large numbers of bids in the hours before Urner Barry's daily publication; submitting bids that were never intended to result in an executed trade; executing off-exchange transactions at above-market prices for the specific purpose of giving Urner Barry a transaction "to hang its hat on"; and directly lobbying Urner Barry's reporters to secure a higher published quotation. Evidence of Defendants' manipulation of the Urner Barry index was recently disclosed through the complaint filed by the United States Department of Justice and several state attorneys general. *See United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), Dkt. 1 ("Government Complaint").[4]

##### (i)    Executing Premium Trades to Give Urner Barry Reporters Something "To Hang [Their] Hat On"

143.    Urner Barry's hierarchy places completed, bona fide trades at the top of the

---

[4] The Government Complaint is appended to this complaint as Exhibit A.

information it considers, and net-short Defendants' routine need to purchase eggs from their competitors gives inter-Defendant trades a built-in appearance of ordinary commercial activity. Defendants exploited both features, arranging trades with one another and placing trades on- or off-ECI at inflated prices for the specific purpose of giving Urner Barry's reporters completed transactions to point to in justifying a higher quotation.

144. For example, on August 7, 2023, a Cal-Maine executive sent a text message to a Versova executive asking, "[a]ny more eggs?" and noting that Urner Barry's market reporter "needs premium trades to hang her hat on." The Cal-Maine executive then proposed to buy eggs at premium prices, and the two negotiated the delivery date of the trade. Cal-Maine and Versova went on to execute three private trades—*i.e.*, trades not executed on ECI or a similar platform—at premium prices, and Cal-Maine shared the resulting purchase orders directly with Urner Barry. Urner Barry had kept its price quotations for white, large shell eggs unchanged across all regions except California since May 26, 2023; it then increased those quotations across all regions except California on each day between August 9 and August 11, 2023. On August 9, 2023, the CEO of a large egg cooperative forwarded Urner Barry reports to Cal-Maine and wrote, "[f]inally!!!!"

145. Other Defendants also coordinated premium producer-to-producer trades during this time period. The Egg Producer Defendants' pattern of coordinated trading, paired with coordinated Urner Barry communications, continued into late 2024 and at least through March 2025, when the Department of Justice publicly announced that it had begun a price-fixing investigation targeting U.S. egg producers.

146. The inter-defendant trades, however, were only one of the tactics deployed within the Defendants' conspiracy to manipulate Urner Barry benchmarks and ultimately, wholesale and retail shell egg prices during the Class Period.

(ii)    Coordinating the Timing, Volume, and Direction of Bids to Push or
Hold the Benchmark ("Bidding Early and Often")

147.    Defendants also coordinated the timing and volume of the bids they placed on ECI, submitting large numbers of bids in a short window—including bids that were never intended to result in an executed trade—so that Urner Barry's reporters would observe what appeared to be broad-based, diverse bidding activity and adjust benchmark prices accordingly. Defendants used this same coordinated bidding both to push the benchmark upward and, at other times, to hold it steady against a decline.

148.    On the morning of October 14, 2022, a Cal-Maine executive texted Hickman's CEO: "We are bidding up. Let's hold it today." Later that day, Hickman's CEO called a then-Cal-Maine executive by phone. By the end of the day, Hickman's and Cal-Maine's bids on ECI accounted for over half of all bids submitted that day, and Urner Barry kept its price quotations for white, large shell eggs unchanged across all regions. A Cal-Maine executive then texted Hickman's CEO, "[n]o change," acknowledging that, as they had intended, Urner Barry had kept its quotations the same. During this same time period, other egg producers also pressured Urner Barry to hold egg prices steady or increase them.

149.    In December 2022, when egg prices were at rapidly-inflated levels, egg producers coordinated to push them up yet further. For example, on December 19, 2022, following a regularly scheduled weekly call among Cal-Maine, Versova, and Hickman's, Hickman's CEO emailed the group: "[n]eed to push the spread into the northwest . . . ." A senior Versova executive replied a few hours later that "[o]ur team will be bidding for additional loads again tomorrow." Hickman's CEO responded, "[i]f we all bid in our respective areas for the 3-5 loads minimum we are short . . . the market reporters will have to address," and the group continued discussing the plan by phone throughout the day. That same day, Urner Barry increased its price quotations for white, large shell

34

eggs across all regions.

150.    Hickman's CEO repeated his request to push up egg prices by coordinated bidding on December 20, 2022 emailing senior executives at Cal-Maine, Versova, and others: "[p]lease consider posting strong bids, early and often. The market reporters don't get in for another hour, so it will be good for them to see diverse bidding upon logging on." He followed up shortly after: "[h]urry[.] There are only 16 bids on ECI right now and 15 of them are ours." Within minutes, Cal-Maine, Versova, and Hickman's collectively submitted dozens of bids, most at premium prices; Hickman's CEO then had several phone calls with executives at Versova and Cal-Maine. Urner Barry again increased its quotations for white, large shell eggs across all regions on December 20.

151.    On December 21, 2022 Hickman's CEO emailed senior executives at Cal-Maine, Versova, and ProEgg warning that Urner Barry's market reporter was "trying to set the stage for [market prices] to retrace" and instructing the group to "bid openly for eggs, especially mediums and eggs into the northwest." Consistent with that instruction, Cal-Maine, Versova, and Hickman's collectively submitted dozens of bids that morning, and Urner Barry increased its quotations for white, large shell eggs across all regions that day as well.

152.    The same day, when Urner Barry's own report later noted that bidding volume had declined from the prior day, the CEO of an egg cooperative wrote that Urner Barry was "prepared to pull the market down," and joined Hickman's CEO in urging the group: "[a]s a group we need to bid like they vote in Chicago, early and often." Hickman's CEO called a now-former Cal-Maine executive three times throughout the day. Hickman's CEO repeated the instruction the next morning, emailing senior executives from Cal-Maine, Versova, the egg cooperative, and others, under the subject line "bids," stating "[t]here is only a 2 cent premium for NW [Northwest] large

35

over SC [South Central] large" eggs; "[b]id early and often today."

153. Following that directive, on December 22, 2022 a senior Versova executive instructed another Versova executive to "light up the northwest bids please, .02 over"—*i.e.*, two cents above Urner Barry's then-current Northwest quotation—and that executive placed bids accordingly. When one Versova executive later noted that the "NW bids are getting hit" (meaning a seller was offering to sell eggs to meet the bid), the other stated that he should delete the bids, indicating Versova did not actually need the eggs.

154. That same day, Cal-Maine, Versova, and Hickman's collectively submitted dozens of bids on ECI, and Urner Barry increased its quotations across all regions, including the Northwest. Hickman's CEO circulated the resulting Urner Barry report to the group, noting that "[e]gg prices [were] hitting records," and adding, "great job in the northwest today!"

155. This pattern continued across the Class Period, including in late 2024. In the afternoon on December 3, 2024, Hickman's CEO spoke by phone with executives from Cal-Maine and Versova. Early the next morning, December 4, 2024 a former Cal-Maine CEO texted Hickman's CEO: "[l]et it rip." After that, Defendants significantly changed their bidding behavior: they submitted more bids per day, and a greater percentage of their bids were at premium prices and went unfilled.

156. Defendants continued to lobby Urner Barry through the 2024 holiday season for ever-higher quotations, including by asking Urner Barry to place less emphasis on transactions by non-Defendants that could have pulled quotations down.

(iii)    Directly Lobbying and Pressuring Urner Barry Personnel

157. Beyond bidding and trading activity, Defendants also exerted direct pressure on Urner Barry reporters and editors—by phone, voicemail, and in personal communications—urging them to adopt higher quotations and to incorporate Defendants' inflated or otherwise manipulative

transactions in the daily spot price.

### 2. Defendants Used HPAI as a Pretext and Deliberately Slowed Flock Recovery to Sustain an Artificial Supply Shortage

158.    Defendants publicly blamed unprecedented egg price increases on the 2022 outbreak of Highly Pathogenic Avian Influenza ("HPAI"). While the outbreak itself was real, Defendants exploited it as a pretext to create the false appearance of a nationwide egg shortage. The magnitude, duration, and pattern of the price spikes during the Class Period cannot be explained by the actual impact of HPAI. Instead, USDA data, industry filings, and contemporaneous reporting show that Defendants used the outbreak as cover to impose prices far above what any genuine supply disruption could justify—and then collectively slowed the restoration of their flocks to prevent prices from naturally correcting.

159.    The actual impact of HPAI on egg production was far more limited than Defendants claimed. USDA data shows that the monthly U.S. egg-laying flock in 2022 never fell more than 6.7 percent from its five-year average, and monthly egg production never fell more than 5.6 percent. In the month preceding the first detection of HPAI in commercial flocks, national retail egg inventories were 22 percent above the four-year average. And crucially, per capita egg production in the United States has not fallen below per capita egg consumption in any year between 2022 and 2025—meaning there was no actual nationwide shortage of eggs during the Class Period.

160.    Nevertheless, Defendants invoked the avian flu outbreak as a pretext to manufacture a false sense of scarcity. They portrayed the effects of avian flu as cataclysmic, fostering the perception of a severe supply crisis. An Urner Barry analyst hinted that the real reason for high prices was that egg producers were relying on the "psychology" and the public's awareness of the flu outbreak, rather than simply economics, and were "confident about the value

they can offer to the market."

161.    To maintain their manufactured false sense of scarcity and sustain artificially inflated egg prices, Egg Producer Defendants slowed the restoration of the flocks lost to avian influenza in a concerted fashion, despite having both the capability and the economic incentive to replenish production quickly.

162.    In a competitive market, when prices surge, producers have a strong incentive to ramp up production quickly. They want to capitalize on high prices before supply rebounds and drives prices back down. This rapid response mechanism helps stabilize markets over time, as higher profits encourage more output, which eventually balances supply and demand.

163.    The U.S. egg industry is particularly well positioned to respond rapidly to avian influenza outbreaks. Over decades, producers have developed a standardized, efficient protocol for depopulation, disposal, cleaning, disinfection, and repopulation. Once an outbreak is confirmed, the affected facility is quarantined and the response begins immediately. A recent example from a 1.33 million-hen commercial egg-laying facility in Weld County, Colorado illustrates the speed of this process:

January 28, 2026 – Mortality event identified to state authorities

January 30, 2026 – Infection officially confirmed

February 6, 2026 – Depopulation and disposal completed

March 4, 2026 – Cleaning and disinfection completed, Control Area for facility released

March 17, 2026 – Premises quarantine lifted

164.    Less than sixty days passed between the initial mortality event and the lifting of quarantine, for a relatively large commercial egg farm—and state agriculture reports suggest the above timetable is standard, not an outlier. In short, rapid recovery from an avian flu outbreak is

38

not only possible, but routine.

165.    Historical experience confirms this pattern. During the 2014–2015 HPAI epidemic, producers lost more than 35 million hens. Yet the industry fully replenished its flocks within eight months. Prices initially spiked due to the supply shock, but as producers rebuilt their flocks, egg production rebounded sharply. By 2016, prices had fallen to levels even lower than before the outbreak.

166.    Egg producers themselves acknowledge this dynamic. As Cal-Maine has stated, "in the past, during periods of high profitability, shell egg producers have tended to increase the number of layers in production . . . which generally has caused a drop in shell egg prices until supply and demand return to balance."

167.    During the Class Period, however, Defendants did the opposite. Rather than restoring production as competitive market forces required, Defendants collectively slowed it. Their coordinated restriction on output prevented the national egg-laying flock from returning to its pre-outbreak level of roughly 330 million hens, even as prices remained historically high.

168.    The sluggish recovery was not the result of increased culling during the HPAI outbreak. Instead, it stemmed from Defendants' collective refusal to expand the placement of fertilized eggs into incubators and to increase the hatching of chicks. By holding back on these essential steps, Defendants choked off the supply of new layers and ensured that flock growth remained stagnant.

169.    The data affirms that this was abnormal behavior. Since 2022, the monthly decline in the egg-laying flock has mirrored the losses seen in 2015—when the HPAI outbreak wiped out 43 million hens. Yet despite similar flock reductions, prices since 2022 have risen more than three times more per hen lost than during the earlier epidemic. The only meaningful difference is

39

Defendants' concerted effort to manipulate market pricing, as detailed above, and their coordinated refusal to rebuild supply at the pace the market would ordinarily dictate.

170.    During the Class Period, instead of increasing pullet placements to capitalize on record-high prices, Defendants added roughly 20 million fewer pullets—even though breeders and hatcheries were producing more fertilized eggs and production costs had fallen significantly since 2022. This deliberate slowdown ran directly counter to each producer's individual economic incentives. By collectively restraining the rebuilding of their flocks, Defendants manufactured the appearance of an ongoing egg shortage and insulated their artificially inflated prices from the normal corrective pressure of increased supply.

**B.    The Historically High Price of Commodity Shell Eggs Cannot be Explained by Market Forces**

171.    Defendants' conspiracy caused egg prices to rise to unprecedented heights. The wholesale price of Grade A Large White Shell Eggs—as reported by the Federal Reserve and mirrored in the Urner Barry Egg Index—jumped from roughly $0.50–$1.30 per dozen in 2021 to $1.50–$5.00 per dozen in 2022. This represented an extraordinary increase of approximately 200 to 285 percent in a single year. Although prices briefly moderated in 2023, they began climbing again by August 2024, reaching $3.00–$6.00 per dozen by the end of that year. By March 2025, the national weekly egg price index hit an all-time high of approximately $6.23 per dozen, with some grades reaching $8.00.



Source: U.S. Bureau of Labor Statistics via FRED®
Shaded areas indicate U.S. recessions.

172.    Defendants and other industry participants have claimed that the market forces of consumer demand, increasing input costs, and bird flu are what caused price inflation across the Class Period. But publicly available data, including data from Defendants, confirms that these market forces, taken together, do not explain the dramatic rise in Commodity Shell Egg prices during the Class Period.

173.    Rather, during the Class Period the price of Commodity Shell Eggs rose much more sharply than competitive market forces would otherwise sustain. This divergence between observed Commodity Shell Egg prices and market fundamentals during the Class Period is more consistent with a coordinated effort to artificially inflate benchmark pricing and restrict supply than it is with independent, self-interested business decision making. And previously non-public information, including direct evidence of coordinated bid-rigging and benchmark manipulation by the Egg Producer Defendants, makes pellucid that price inflation in the Class Period was artificial—driven by an anticompetitive conspiracy—rather than natural.

1.    <u>The sharp rise in egg prices since 2022 cannot be explained by Avian Flu</u>

174.    Defendants have blamed the spread of HPAI for higher egg prices. In reality, however, HPAI does not explain the unprecedented surge in egg prices.

175.   The pretextual nature of the avian flu excuse is evident, as this was not the first time the egg industry had been hit by a large bird flu outbreak. The reduction in the egg-laying flock size of 43.3 million was similar to that in 2015, when avian flu killed 43 million egg-laying hens.

176.   Nevertheless, prices over the Class Period rose ***more than three times*** more per lost hen than they did during the earlier outbreak.

177.   Data from the USDA National Agricultural Statistics Service (NASS) and U.S. Bureau of Labor Statistics (BLS) Consumer Price Index Average Data for a dozen large eggs, as shown in the figure below, demonstrates the staggering price differences between the 2015 and 2022 outbreaks, and shows that the dramatic price hikes that began at the onset of the 2022 HPAI outbreak occurred in the face of relatively stable egg production compared to the more severe and prolonged shortage in 2015.



178.   Average wholesale egg prices compared to egg-laying hen inventory lend further

support to the conclusion that Defendants used HPAI as a pretext to justify their coordinated pricing activity during the Class Period as, despite relatively stable inventory, wholesale egg prices have soared compared to those in 2015.



179.    Indeed, the actual decline in domestic supply from HPAI during the Class Period was even smaller than flock reductions indicated, as egg exports decreased and the egg-per-hen rate increased due to genetic improvements. Adjusting for these factors, the effective reduction in supply in 2022 was about 3.5 million hens, or about a 1 percent decrease in the national flock against 2021. The figure below shows table egg production versus table egg-laying hen population in the United States before and during the Class Period.



180. As shown in the above figure, at no point in the first three years of the Class Period did the supply of egg-laying hens or Shell Eggs fall below 2015 levels.

181. Analysts and consumer advocates have noted that bird flu losses in recent years have been insufficient to explain the magnitude of the price spikes during the Class Period. Hunterbrook's analysis of USDA data found that the effective reduction in the national hen flock was only about 1% compared to 2021, yet average wholesale prices rose 127% in 2022. Average wholesale prices rose 54.6% in 2023—a 17% increase in price per 1% decrease in supply—and 127.7% in 2024—a 25% increase in price per 1% decrease in supply.

182. Indeed, from 2022 through 2024, price increases per unit of supply loss were three to four times greater than during the 2015 avian flu outbreak—a disparity that cannot be explained by legitimate cost or demand changes. In 2015, egg prices rose only 7.16% for each 1% decline in flock size, and prices normalized within a year as supply recovered. By contrast, in 2022 prices jumped 33% per 1% flock reduction, followed by 17% in 2023 and 25% in 2024—multipliers inconsistent with normal market behavior.



183.    The data suggests that claims of an unprecedented shortage due to Class Period HPAI were (and are) overstated. One advocacy group, analyzing USDA data, reported that losses in the total size of the U.S. egg-laying flock as a result of Class Period bird flu were actually quite modest. In a month-to-month comparison to 2021, the egg-laying flock was, on average, only 3.82% smaller in each month of 2022, 3.16% smaller in each month of 2023, and 5.18% smaller in each month of 2024. These small declines cannot plausibly account for the extreme and sustained price spikes observed during the Class Period.

184.    The spike in U.S. egg prices becomes even more perplexing when contrasted with Europe, which experienced a severe supply shortage in 2022 after the depopulation of 50 million layers—compared to 43 million in the U.S. Despite this, European egg prices increased by only about 30% from January 2022 to January 2023, whereas U.S. prices surged nearly 170% over the same period.

2.    <u>There were no material constraints to rebuilding flocks and production capacity</u>

185.    The industry's ability to rebuild flocks with over 35 million hens within 8 months

following the 2015 HPAI outbreak demonstrates the absence of structural barriers to restoring supply.

186.    As to the avian flu during the Class Period, however, the egg-laying flock has not yet recovered to its pre-outbreak size of roughly 330 million hens. Between 2023 and 2024, flock size fluctuated between 310 and 320 million before falling to 300 to 320 million in 2024.

187.    In reality, as explained earlier in this complaint, the Egg Producer Defendants could have restored supply of Commodity Shell Eggs more quickly than they did—and their slow pace in doing so indicates a deliberate decision, one inconsistent with recent prior industry behavior and which cannot be explained by physical or logistical constraints.

### 3.    Input costs do not explain Shell Egg price increases

188.    Chicken feed is a significant marginal cost of Commodity Shell Egg production. Feed, primarily corn and soybean meal, is therefore also a primary cost component in shell egg production, which accounts for more than half of production costs. Other sources have indicated feed costs could represent as much as 60 to 70 percent of egg farm production costs.

189.    According to one study, between 2021 and 2022, processing costs increased by approximately 20 percent. Cal-Maine's 2022 financial statement reported that egg farm production and feed costs rose by 22 percent compared to 2021.

190.    Yet, according to the Urner Barry Midwest Price Report, between December 20, 2021, and December 19, 2022, the wholesale price for a dozen large Grade A Commodity Shell Eggs jumped from approximately $1.76 to approximately $5.43—an increase of 208 percent.

191.    The significant divergence between feed input costs and the price of Commodity Shell Eggs is economically significant and indicates that prices were not being established by competitive market forces. Rather, the fissure between feed costs and the dramatic and sustained price increases, in the absence of similarly elevated and sustained input costs, is indicative of and

46

consistent with coordinated efforts to raise and fix prices at supracompetitive levels.

192.    The same dynamic occurred in other input costs for egg production. As one executive at a pasture-raised eggs producer—a producer that does not sell Commodity Shell Eggs priced by Urner Barry—explained: "I don't see anything in my cost structure that would have led me to raise our prices by as much as you're reporting. . . . I can't explain why prices have gone as high as they have."

193.    As shown below, energy costs appear wholly detached from Commodity Shell Egg prices during the Class Period, as prices rose dramatically in the face of declining energy costs.



194.    According to public sources and industry disclosures, other input costs, such as grower compensation and pay, have also remained flat or experienced modest increase during the Class Period. Indeed, over a six-year period overlapping the Class Period, industry giant Cal-Maine's per-egg supply costs appear to have barely increased at all. Documentation obtained by Farm Action from a farming family with a long-standing Cal-Maine supply contract reveals that contract farmers received only a $0.0125 per dozen increase over a six-year period—a total

payment of $0.2675 per dozen—even as Cal-Maine's benchmark-driven wholesale prices increased threefold.

195. Increases in production costs simply do not explain the steep price increases exhibited during the Class Period for Commodity Shell Eggs. Under competition, one would expect price paths to track costs and supply shocks. That has not been the case for Commodity Shell Eggs in the United States during the Class Period. Instead, prices and costs have diverged, to the profit of Commodity Shell Egg producers, and in particular, the Egg Producer Defendants.

4. Defendants' Financial Records Confirm Price Increases Were Not Cost-Driven

196. Compelling evidence that cost increases cannot explain Class Period egg prices also comes from Defendant Cal-Maine's own financial statements. In a competitive commodity market, producers facing higher input costs can, at most, pass those increases through to customers on a roughly one-to-one basis. Revenues may rise, but profit margins remain flat—or more commonly, shrink—because competitive pressure prevents firms from fully passing on cost increases without losing customers to lower-priced rivals. Margin expansion—profits growing dramatically faster than costs, without a corresponding increase in demand—is the opposite of what competitive markets produce. And the egg industry's own publications indicate no massive expansion in market-wide demand over the Class Period. Given this context, any increase in the cost of shell egg production over the Class Period cannot explain the several-fold increase in profits over the same time frame. Instead, these profits are an unmistakable economic signature of supracompetitive pricing power.

197. Cal-Maine's financial results during the Class Period reflect exactly that pattern. Reports show that while Cal-Maine's sales volume remained stable, its profit margins exploded, with multiple quarters of gross profit exceeding the company's prior full-year totals. Before the

48

avian flu outbreak, Cal-Maine reported gross profits of $179.6 million in FY20 (June 2019–June 2020) and $160.7 million in FY21 (June 2020–June 2021), while annual egg production held steady at approximately 1.1 billion dozen eggs.

198. After the 2022 avian flu outbreak, however, Cal-Maine's profits skyrocketed. The company reported $1.2 billion in gross profit in FY23 (June 2022–June 2023) and $541.6 million in FY24 (June 2023–June 2024), again with sales volume essentially unchanged at roughly 1.1 billion dozen eggs per year. The trend continued into FY25, with Q1 and Q2 gross profits of $247.2 million and $356.0 million, respectively. On average, Cal-Maine's annual profits increased 747% in the first full year of the Class Period (FY23), stayed elevated for another two years, then collapsed upon the announcement of a DOJ price-fixing investigation. These results are not reflective of a competitive market responding to higher costs.

199. Moreover, Cal-Maine insiders reaped huge profits from the anticompetitive scheme. Just after the DOJ investigation was announced in March 2025, members of late Cal-Maine founder Fred R. Adams Jr.'s family sold 3 million shares of stock totaling $320 million. At the same time, Adams's son-in-law, Cal-Maine Board Chair (and prior CEO) Adolphus Baker, sold a staggering 43% of his Cal-Maine stock holdings for a profit of $116 million on April 17, 2025.

200. Since the announcement of a price-fixing investigation by the DOJ in March 2025, Cal-Maine's revenues and profits have cratered. According to Cal-Maine's February 28, 2026 10-Q, the company's year-over-year net sales decreased *53%* between the quarter ending March 1, 2025 ($1.418 billion), and the quarter ending February 28, 2026 ($667 million). The company's net income—its profits—decreased a staggering *90%* over the same time frame ($508 million in the quarter ending March 1, 2025; $50 million in the quarter ending February 28, 2026). Taking

49

into account the thirty-nine weeks preceding these two dates, Cal-Maine's net sales decreased year-over-year by more than 25% ($3.158 to $2.359 billion), and its net income by 60% ($876 to $353 million).

201.    Cal-Maine itself attributed its extraordinary profits over the Class Period to higher selling prices, and its post-Class Period revenues and profits cratered alongside market prices upon disclosure of the DOJ price-fixing investigation. Although the other Egg Producer Defendants are privately held, the unprecedented pricing conditions during the Class Period—conditions wholly disconnected from production costs or genuine supply constraints—support the reasonable inference that they too reaped profits far above historical norms.

        5.      <u>The sharp decrease in prices following the DOJ's announcement of its investigation indicates that the price of shell eggs was not driven by market forces</u>

202.    On March 6, 2025, various news outlets, including The Capitol Forum and The Wall Street Journal, reported that DOJ was investigating whether egg producers—including Defendants Cal-Maine and Rose Acre—had conspired to raise prices of eggs. According to the reporting, DOJ sent letters to egg producers asking them "to preserve documents about their pricing conversations with customers and competitors, as well as communications with Urner Barry."

203.    In a 10-Q SEC filing published April 8, 2025, Defendant Cal-Maine confirmed it was under investigation by DOJ. In that filing, it stated that it received a civil investigative demand from DOJ in March 2025.

204.    After the investigation became public, egg prices dropped precipitously. For instance, on March 5, the average wholesale cost of a dozen large Grade A white eggs was $8.12. On March 19, about two weeks after DOJ's investigation became public, those same eggs cost $3.03—a 62.7 percent decrease. Egg prices at retail also dropped around this time.

205.    This did not go unnoticed. On May 8, 2025, in a letter supporting the DOJ's investigation, Senators Elizabeth Warren and Jim Banks expressed "concern[] that record high egg prices reflect noncompetitive behavior among large producers."

206.    The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces.

207.    On April 17, 2026, the Wall Street Journal reported that the DOJ was preparing to file an antitrust lawsuit against some of the largest U.S. egg producers, including Cal-Maine and Versova.

208.    On June 29, 2026, the DOJ and several states indeed filed such a lawsuit, as described in more detail below.

**C.    Plus Factors Corroborate Defendants' Conspiracy**

209.    Plus factors are economic actions and outcomes, above and beyond parallel conduct among oligopolists, that are largely inconsistent with unilateral conduct but consistent with coordinated action, and that support an inference of conspiracy. Detecting a cartel is much like diagnosing a disease: no single symptom is dispositive, but taken together, the plus factors described below make the diagnosis of an unlawful conspiracy far more reliable than parallel conduct alone.

210.    The plus factors that corroborate the conspiracy alleged in this Complaint include: (1) a government investigation and enforcement action targeting the same benchmark-manipulation scheme; (2) Defendants' actions against their unilateral economic self-interest; (3) Defendants' history as recidivist antitrust violators; (4) Defendants' common motive; (5) the fungible, interchangeable nature of Commodity Shell Eggs; (6) inelastic demand for Commodity Shell Eggs; (7) Defendants' numerous opportunities to collude; and (8) high barriers to entry.

1.    A Government Investigation and Enforcement Action Targeting the Conduct Alleged in this Complaint

211.    On June 29, 2026, the U.S. Department of Justice and seventeen state attorneys general filed a civil antitrust enforcement action in the U.S. District Court for the Northern District of Iowa against Cal-Maine, Versova, and Hickman's Egg Ranch, Inc., alleging that those companies violated Section 1 of the Sherman Act by conspiring to submit coordinated bids designed to artificially inflate Urner Barry's daily egg price quotations between 2022 and 2025—the same benchmark, the same mechanism, and substantially the same period at issue in this Complaint. *United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa, filed June 29, 2026). That action followed a lengthy federal investigation, publicly reported to have begun in March 2025.

212.    While the government's civil action names only a subset of the entities alleged to have participated in the conspiracy described in this Complaint, its detailed factual findings—summarized above—corroborate that the mechanism by which Defendants are alleged to have manipulated the Urner Barry benchmark is not a theoretical vulnerability, but one that has already been investigated and pursued by federal and state enforcers. The existence of a parallel government enforcement action targeting the same benchmark, the same conduct, and overlapping Defendants is itself a powerful corroboration of the conspiracy alleged here.

2.    Defendants Acted Against Their Unilateral Economic Self-Interest

213.    No individual Egg Producer Defendant, acting alone, could meaningfully move the Urner Barry benchmark through unilateral bidding or reporting. As described above, Urner Barry's quotations are built from aggregated market data, and a producer who unilaterally reported prices detached from prevailing conditions would risk both damaging its credibility with Urner Barry's reporters and losing access to a pricing tool on which the producer's own contracts depend.

Unilateral manipulation is accordingly self-defeating; coordinated manipulation, in which multiple producers reinforce one another's bids and reports, is not.

214. Likewise, in a competitive market, a producer that sees prices and margins surge has every incentive to expand output as quickly as possible to capture the elevated prices before competitors respond—a dynamic that, in previous avian-influenza episodes, produced swift production recoveries. As described above, however, Defendants collectively slowed the restoration of their flocks during the Class Period despite favorable conditions and declining costs. That restraint yields sustained supracompetitive prices only if all major producers refrain from expanding output at the same time—an outcome that requires mutual assurance that no competitor will break ranks to capture market share, and that is difficult to explain as the product of independent, unilateral decision-making.

### 3. Some of the Egg Producer Defendants are recidivist conspirators

215. The egg industry, including several of the Defendants named here, has previously been targeted by private litigants for anticompetitive and unfair business practices.

216. In 2008, direct purchasers of processed egg product sued Egg Producer Defendants Cal-Maine, Daybreak, Hillandale, and Rose Acre alleging that these producers, along with other trade groups and egg producers, conspired to limit the supply of eggs in order to raise prices by enforcing supply restrictions by jointly developing and implementing an egg certification program, exporting eggs, and declining production by reducing hatch, early molting, and hen disposal. *See In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719 (3d Cir. 2020).

217. All defendants but one settled with the direct purchasers for a total recovery of approximately $136 million. *See In re Processed Egg Products Antitrust Litigation*, No. 08-md-2002 (E.D. Pa.).

218. In 2011, Kraft Foods Global, Inc., the Kellogg Company, General Mills, Inc., and

Nestlé USA, Inc. sued Cal-Maine, Rose Acre, and trade group United Egg Producers, among others, in the Northern District of Illinois on antitrust allegations similar to those brought in the E.D. Pa. MDL, but including allegations about the unusually cozy nature of the egg industry. *See Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*, No. 1:11-cv-08808 (N.D. Ill.). After a seven-week jury trial, a jury found that Cal-Maine and Rose Acre conspired with each other and returned a $17.8 million verdict (before trebling) on Kraft's and Kellogg's price-fixing claim. On November 6, 2024, the court rendered Final Judgment against Cal-Maine, Rose Acre, United Egg Producers, and United States Egg Marketers, Inc. in the amount of $53.3 million, plus reasonable attorney's fees. *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*, No. 1:11-cv-08808 (N.D. Ill.), Dkt. 720 (Nov. 6, 2024).

### 4.    Defendants Have a Common Motive

219.    Further, the Egg Producer Defendants had a common motive to manipulate Urner Barry benchmark prices during the Class Period—inflating that single benchmark would have the effect of inflating actually-paid wholesale and retail egg prices nationwide, thereby greatly increasing the Producer Defendants' revenues and profits given the highly inelastic nature of commodity shell egg demand in the United States. And indeed, this is exactly what happened, with not just egg prices but egg producer profits—as seen in SEC filings by Cal-Maine, the only publicly-traded Producer Defendant—doubling, tripling, and even quadrupling over the Class Period (and immediately collapsing upon revelation of a DOJ price-fixing inquiry).

### 5.    Commodity Shell Eggs Are Fungible

220.    Conventional and cage-free shell eggs are fungible commodities with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a

commodity market can be destructive to profits. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power.

221. Government grading standards make Commodity Shell Eggs functionally identical within regions, eliminating non-price competition and simplifying the detection of price deviations.

### 6. Commodity Shell Eggs Have Inelastic Demand

222. Commodity Shell Eggs also exhibit relatively inelastic demand—*i.e.*, consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period. A market with inelastic demand is more susceptible to collusion and price-fixing because competitors can raise prices without suffering a significant decrease in sales or profit.

223. The inelasticity of demand for eggs is widely acknowledged within the industry. UEP president Gene Gregory told Egg Industry magazine in February 2007 that "[w]hether eggs are 39 cents or $1.25 per dozen, customer purchases are the same." Agricultural economist Jada Thompson has similarly explained that egg buyers, including processors who use eggs as an input in other food products, have no substitute for what they need: "We demand eggs . . . in order to make the bread, they need eggs. In order to buy those eggs, there's a low supply, so they're going to keep bidding until they get those eggs." As Dr. Thompson observed, this dynamic means that "Cal-Maine or any other company that is able to sell eggs during periods of high price [is] going to basically win out" by capturing additional profit from the only available supply.

224. As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter."

225. Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Defendants can elevate prices to

artificially high levels with little concern that higher prices will materially reduce sales volume or diminish profits.

### 7.    Defendants Have Numerous Opportunities to Collude

226.    Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy. The Egg Producer Defendants are members of UEP and the American Egg Board ("AEB"), national trade associations representing large U.S. egg producers. These associations host meetings, conferences, and committee gatherings that bring together high-level executives from competing firms, providing a forum for illegal discussions and coordination.

227.    For example, since 2021, the AEB and UEP have hosted an annual joint conference attended by Producer Defendants.

228.    Moreover, employees of the Egg Producer Defendants have been on the board of UEP. Rose Acre's participation in UEP is revealing. For over thirty years, Rose Acre declined to join UEP. Then, in 2002, Rose Acre not only joined but immediately placed its CEO, David Rust, on the UEP Board—at the precise moment when the supply-restriction conduct that the jury later found unlawful in *Kraft Foods Global, Inc. v. United Egg Producers, Inc.* was taking hold. Rust explained that he wanted to serve on the board of directors so that he could get "a vote at the table." Rose Acre's sudden commitment to UEP governance coincided with its adoption of the UEP Certified supply-restriction program. In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-large. The presence of senior executives from multiple Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

56

229. Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in the *Kraft Foods* case was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs. UEP Certified is still in force today.

230. Additionally, Urner Barry hosts an annual Executive Conference which employees of Defendants have attended during the Class Period. Urner Barry markets this event as "a must-attend event for decision-makers in the protein industry . . . Where the protein industry's most influential members go to network, learn and advance their professional development." Employees of Defendants have even been seen together at these conferences. Urner Barry and Rose Acre employees were photographed together at the 2011 conference. In 2021, Bill Rehm, CEO of Daybreak, was a scheduled guest speaker at the conference. Finally, Defendants, including Cal-Maine, have sponsored this event in the past. Trade association membership and industry events provide Defendants opportunities to collude.

231. In addition to UEP and the Urner Barry Executive Conference, the World Egg Organization ("WEO") hosts an annual Global Leadership Conference that brings together the senior leadership of the world's largest egg producers. Marcus Rust, CEO of Defendant Rose Acre, was named WEO's International Egg Person of the Year at the most recent conference. These international forums provide Defendants with additional opportunities to communicate outside of domestic channels and to align on production and pricing strategy.

8. High Barriers to Entry Protect the Conspiracy from Competitive Discipline

232. Egg producers face significant entry barriers including financial, regulatory, operational, and logistical costs. Potential new entrants face a variety of capital costs, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering,

57

climate control, and waste management equipment. One industry source estimated that between permitting (one year or more), construction (approximately six months after building contracts have been issued), and stocking (roughly four months to raise a pullet flock), it can take up to two years before production of shell eggs can be expected from new housing. Potential new entrants would also need to displace longstanding customer relationships. Further, because of the vertically-integrated nature of the largest egg producers, including with respect to breeding, packaging, processing, transportation, and sale to the largest retailers, reliance on or economic interdependence with one or more of the Egg Producer Defendants is a de facto requirement for a new or smaller producer of Commodity Shell Eggs. As a result, new entrants into the market are unlikely to discipline cartel pricing.

233.    These figures are not hypothetical. A 2013 USDA report estimated that a typical Midwest multi-age, inline egg production facility housing 1.5 to 4.0 million laying hens requires a capital investment ranging from approximately $24 million (for a 1-million-hen operation) to $80 million (for a 4-million-bird complex). Consistent with those figures, Rose Acre broke ground in May 2023 on a new Arizona facility projected to cost $100 million, and Cal-Maine spent an estimated $54 to $67 million in 2023 to acquire Fassio Egg Farms and $110 million in 2024 to acquire the operations of ISE America. When a market is protected by barriers to entry and exit of this magnitude, conspirators can fix supracompetitive prices with little concern that new entrants will bid the price back down.

**DEFENDANTS ARE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS**

234.    During the Class Period, Defendants continued to sell Commodity Shell Eggs to Plaintiffs and other putative Class Members at prices artificially inflated by Defendants' conspiracy. The artificial increases to the pricing of Commodity Shell Eggs set forth in this

complaint had long-lasting and continuing effects which resulted in Class Members continuing to pay artificially inflated prices for Commodity Shell Eggs continuing through the present. Furthermore, Class Members purchased Commodity Shell Eggs frequently and consistently throughout the Class Period.

235.    Due to ever-fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their conspiratorial agreement. This resulted in multiple coordinated effective price increases throughout the Class Period, as described here. Moreover, each of these activities resulted in new, overt acts that injured Plaintiffs and the putative Classes, thus creating a new cause of action for purposes of the statute of limitations.

236.    In addition, each sale of Commodity Shell Eggs made to Plaintiffs or the putative Classes that was artificially inflated as a result of the conspiracy also constituted a new, overt act that restarted the statute of limitations.

237.    These new, overt acts—which would not have occurred had the conspiracy disbanded—were not merely reaffirmations of Defendants' previous acts. Rather, they were new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiffs and the other members of the proposed Classes.

238.    As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period and, regardless of any tolling- or estoppel-related arguments, Plaintiffs' claims and those of the putative Classes are not time barred.

### TOLLING OF STATUTE OF LIMITATIONS

239.    Plaintiffs and members of the proposed Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence

of the conspiracy alleged herein until shortly before filing this action. Indeed, key evidence of the conspiracy and its members was only made public in late June 2026, when the Department of Justice and several state attorneys general filed suit against certain egg producers for antitrust violations in *United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), or provided to Plaintiffs through discovery in this litigation. And Plaintiffs and the Class Members had no knowledge at all of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when it was publicly revealed that the Department of Justice was investigating U.S. egg prices.

240.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the proposed Classes, including by coordinating in secret through text messages, phone calls, and emails between high-level executives of conspirators, *see United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), Dkt. 1, and by maintaining as confidential their trading and other activities meant to influence Urner Barry egg price benchmarks.

241.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs and/or members of the proposed Classes has been equitably tolled during the period of such fraudulent concealment, at least until March 2025 if not shortly prior to the filing of this consolidated complaint.

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

242.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Price competition was restrained or eliminated with respect to Commodity Shell Eggs;

B.      The prices of Commodity Shell Eggs were fixed, raised, stabilized, or maintained at artificially inflated levels;

C.      Consumer Indirect Purchasers of Commodity Shell Eggs were deprived of free and open competition; and

D.      Consumer Indirect Purchasers of Commodity Shell Eggs paid artificially inflated prices.

243.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of Commodity Shell Eggs. As a direct and foreseeable result, Plaintiffs and the members of the Classes paid supracompetitive prices for Commodity Shell Eggs during the Class Period.

244.    The price effects of Defendants' conduct particularly impacted the Consumer Indirect Purchaser Class Members in this case who had no choice but to pay higher prices for Commodity Shell Eggs they were unable to purchase or acquire elsewhere.

245.    Egg prices have risen sharply since early 2022. Wholesale prices for Grade-A, Large, White Shell Eggs, which generally ranged from about $0.50 to $1.30 per dozen in 2021, climbed to roughly $1.50 to $5.00 per dozen in 2022. Although prices eased somewhat in 2023, that decline was temporary. By August 2024, prices began increasing again, reaching approximately $3.00 to $6.00 per dozen by the end of the year. By January 2025, the national weekly price index for Grade-A, Large eggs had climbed even higher, reaching about $6.00 to $8.00 per dozen.

246.    At the same time, retail prices also surged. For much of the 2010s, retail egg prices remained relatively stable, typically averaging between $1.50 and $2.00 per dozen. That stability began to break down in early 2022. By December 2022, the average retail price had climbed to

$4.25 per dozen, then rose further to $4.83 per dozen in January 2023. Prices eased during parts of 2023, but the decline did not last. By December 2024, the average retail price had increased again to $4.15 per dozen, reinforcing the broader upward pressure on egg prices.

247. Stew Leonard, Jr., owner of the Stew Leonard's grocery store chain, explained that in December of 2024, his stores were selling a dozen eggs for $10.

248. In February of 2025, a Florida news outlet quoted one grocery store shopper exclaiming, "I just bought eggs and it's crazy. The prices are ridiculous, you can't afford it going up."

249. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Consumer Indirect Purchaser Class Members sustained injury to their property, having paid higher prices for Commodity Shell Eggs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy.

250. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

251. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the members of a class of consumer indirect purchasers seeking injunctive relief (the "Nationwide Consumer Indirect Purchaser Class") defined as follows:

> All persons and entities in the United States and Puerto Rico who indirectly purchased Commodity Shell Eggs from the Egg Producer Defendants or their co-conspirators for non-commercial purposes from January 1, 2022, until such time that the adverse effects of Defendants' anticompetitive conduct cease.

252.    Plaintiffs also bring this action on behalf of themselves, and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "State Law Consumer Indirect Purchaser Class"):

> All persons and entities who indirectly purchased Commodity Shell Eggs from the Egg Producer Defendants or their co-conspirators for non-commercial purposes in Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, Wisconsin, and/or Puerto Rico from January 1, 2022 until such time that the adverse effects of Defendants' anticompetitive conduct cease.

253.    Specifically excluded from the Nationwide Class and State Law Class (collectively "Classes") are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; and any government entity. Also excluded from these Classes is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any Co-conspirator identified in this action.

254.    Plaintiffs reserve the right to modify these definitions or to propose subclasses, as appropriate, based on further investigation and discovery.

255.    **Numerosity**: The members of the Consumer Indirect Purchaser Classes are so numerous that joinder of all members would be impracticable. The exact number of class members in the Consumer Indirect Purchaser Classes is unknown to Plaintiffs at this time, but it is estimated to be in the millions. The members of the Consumer Indirect Purchaser Classes should be readily identifiable from existing records.

256.     **Typicality**: Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs purchased Commodity Shell Eggs indirectly from one or more of the Defendants for non-commercial purposes, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes. Plaintiffs allege injuries that are not unique to them but are typical of members of each of the Classes, including measures of damages and/or nominal damages.

257.     **Common Questions Predominate**: There are questions of law and fact common to the Classes, including, but not limited to:

a.   Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of Commodity Shell Eggs in the United States;

b.   Whether such combination or conspiracy constituted violations of the Sherman Antitrust Act;

c.   Whether such combination or conspiracy violated the antitrust, unfair competition, and consumer protection laws of various states;

d.   Whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiffs and other members of the Consumer Indirect Purchaser Classes;

e.   Whether Defendants caused Plaintiffs and the members of the Consumer Indirect Purchaser Classes to suffer damages in the form of overcharges on Commodity Shell Eggs indirectly purchased from the Defendants or their producing co-conspirators;

f.   The effect of Defendants' conspiracy on Commodity Shell Eggs sold in the United States during the Class Period;

g.   The identity of the participants of the alleged conspiracy;

h.   The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

i.   Whether Defendants fraudulently concealed their misconduct;

j.  Whether Defendants' anticompetitive scheme inflated prices of Commodity Shell Eggs above competitive levels;

k.  The appropriate measure of classwide damages for the Consumer Indirect Purchaser Classes; and

l.  The nature and scope of injunctive relief necessary to restore competition in the Commodity Shell Eggs market.

These and other questions of law or fact which are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

258. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Classes in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes who indirectly purchased Commodity Shell Eggs for non-commercial purposes during the Class Period and Plaintiffs have retained competent counsel experienced in the prosecution of class actions and antitrust litigation to represent them and the Classes.

259. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class Members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. A class action will permit numerous similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, or expense. A class action will provide injured persons with a method for obtaining redress on claims that could not practicably be pursued individually. Moreover, the prosecution of separate actions by individual members of the Consumer Indirect Purchaser Classes would create a risk of inconsistent or varying adjudications, potentially establishing incompatible standards of conduct for Defendants. Plaintiffs know of no manageability or other issues that would preclude maintenance of this case as a class action.

260. **Common Grounds for Injunctive Relief:** Defendants have taken actions that

generally impact the Classes in a consistent manner so that final injunctive relief is appropriate for the Classes collectively under Fed. R. Civ. P. 23(b)(2).

## CLAIMS FOR RELIEF

### COUNT 1
### RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
### (On Behalf of Nationwide Class for Injunctive and Equitable Relief)

261. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

262. Egg Producer Defendants are direct competitors in the Commodity Shell Eggs market throughout the United States.

263. Beginning as early as January 1, 2022, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, and until such time that the adverse effects of Defendants' anticompetitive conduct cease, Defendants and their co-conspirators entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition for the pricing of Commodity Shell Eggs. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices of Commodity Shell Eggs in the United States. Pursuant to the agreement, Defendants agreed to—and did—manipulate the egg industry pricing indices in a manner that distorted and suppressed competition, knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Commodity Shell Eggs sold to Plaintiffs and Consumer Indirect Purchaser Class Members.

264. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

265. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Commodity Shell Eggs throughout the United States to be higher than they otherwise would have been in a competitive market.

266. Defendants' conspiratorial acts caused unreasonable restraints in the market for Commodity Shell Eggs.

267. As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Nationwide Class were harmed by being forced to pay inflated, supracompetitive prices for Commodity Shell Eggs.

268. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A. Price competition for Commodity Shell Eggs was restrained, suppressed, and/or eliminated in the United States;

B. Prices for Commodity Shell Eggs sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators were fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiffs and members of the Nationwide Class were deprived of the benefits of free and open competition in the purchase of Commodity Shell Eggs.

269. Defendants took all the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Commodity Shell Eggs to be higher than it would be, but for Defendants' conduct.

67

270.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Nationwide Class were injured in their business or property and will continue to be injured in their business and property by paying more for Commodity Shell Eggs than they would have paid and will pay in the absence of the conspiracy.

271.   The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

## VIOLATIONS OF STATE ANTITRUST AND CONSUMER PROTECTION LAWS

272.   Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein, excluding the causes of action, into each of the state specific causes of action described below.

273.   During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of Commodity Shell Eggs in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

274.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the alleged combination and conspiracy, including agreeing to fix, raise, maintain, and stabilize the price of Commodity Shell Eggs which injured Plaintiffs and members of the State Law Class.

275.   Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize Commodity Shell Eggs prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the State Law Class were deprived of free and open competition and paid more to purchase Commodity Shell Eggs than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust

and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

276.    In addition, Defendants profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the State Law Class.

277.    Accordingly, Plaintiffs and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each jurisdiction's law, injunctive relief (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

278.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations of the following state antitrust and consumer protection statutes.

### COUNT 2: ARIZONA
**VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT,
ARIZ. REV. STAT. §§ 44-1401, *et seq.*
(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Arizona)**

279.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

280.    Defendants have entered into an unlawful agreement in restraint of trade in the Commodity Shell Egg Market in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq*.

281.    Defendants' conspiracies had the following effects in Arizona: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open

competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Arizona by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

282.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

**COUNT 3: ARKANSAS**
**VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT,**
**ARK. CODE ANN. §§ 4-88-101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Arkansas)**

283.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

284.    Defendants have entered into an unlawful agreement in restraint of trade in the Commodity Shell Egg Market in violation of the Arkansas Deceptive Trade Practices Act, ARK. CODE ANN. §§ 4-88-101, *et seq.*

285.    Defendants' conspiracy had the following effects in Arkansas: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Arkansas; (2) prices of Commodity Shell Eggs in the State of Arkansas were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce.

286.    Defendants' conspiracy unlawfully misleads consumers into believing the price of Commodity Shell Eggs sold in Arkansas was the result of a free market and Defendants' conduct is substantively unconscionable because it unfairly benefits Defendants at the expense of Plaintiffs

70

and members of the Class. ARK. CODE ANN. § 4-88-107. Accordingly, Plaintiffs and members of the State Law Class seek all available relief under ARK. CODE ANN. §§ 4-88-101, *et seq.*, resulting from Defendants' deceptive and unconscionable trade practices.

**COUNT 4: CALIFORNIA**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 16700, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in California)**

287. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

288. During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720.

289. Each defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of Commodity Shell Eggs at supracompetitive levels. The violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Commodity Shell Eggs.

290. For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of Commodity Shell Eggs.

291. The combination and conspiracy alleged herein has had, *inter alia*, the following effects in California: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free

71

and open competition; and (4) Plaintiffs and members of the State Law Class paid supracompetitive, artificially inflated prices for Commodity Shell Eggs.

292. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiffs and members of the State Law Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

293. This combination and conspiracy constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§ 16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of Commodity Shell Eggs "shall be . . . controlled or established" (§ 16720(d)). Defendants' violations of California law were flagrant and willful. The State Law Class has been injured in its business or property in California by Defendants' violations of Cal. Bus. & Prof. Code § 16720.

## COUNT 5: CALIFORNIA
### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in California)

294. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

295. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*.

296. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200.

297.     During the Class Period, Defendants manufactured, marketed, sold, or distributed Commodity Shell Eggs in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, *et seq.*, by engaging in the acts and practices specified above.

298.     The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq.*, set forth above, Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code § 16720, *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Commodity Shell Eggs in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

299.     Plaintiffs and members of the State Law Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused, and continue to cause Plaintiffs and the members of the State Law Class to pay supracompetitive and artificially inflated prices for Commodity Shell Eggs.

300.    Plaintiffs and members of the State Law Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused, and continue to cause Plaintiffs and the members of the State Law Class to pay supracompetitive and artificially inflated prices for Commodity Shell Eggs.

**COUNT 6: COLORADO**
**VIOLATION OF THE COLORADO ANTITRUST ACT,**
**COLO. REV. STAT. §§ 6-4-101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Colorado)**

301.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

302.    Defendants have entered into an unlawful agreement in restraint of trade in the Commodity Shell Egg Market in violation of the Colorado Antitrust Act, COLO. REV. STAT. §§ 6-4-101, *et seq*. Defendants' conspiracy had the following effects in Colorado: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Colorado; (2) prices of Commodity Shell Eggs in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce.

303.    Plaintiffs and members of the State Law Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into

the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused, and continue to cause Plaintiffs and the members of the State Law Class to pay supracompetitive and artificially inflated prices for Commodity Shell Eggs.

304. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Col. Rev. Stat. §§ 6-4-104, *et seq*.

**COUNT 7: COLORADO**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT,**
**COLO. REV. STAT. §§ 6-1-101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Colorado)**

305. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

306. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Revised Statutes §§ 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 8: CONNECTICUT**
**VIOLATION OF THE CONNECTICUT ANTITRUST ACT,**
**CONN. GEN. STAT. §§ 35-24, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Connecticut)**

307. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

308. Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut's Antitrust Act, Conn. Gen. Stat. Ann. § 35-24, *et seq*. Defendants' conspiracies had the following effects in Connecticut: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and

members of the State Law Class were injured in their business or property in Connecticut by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Defendants' violations of Connecticut law were flagrant and willful.

309. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Conn. Gen. Stat. Ann. § 35-24, *et seq*.

**COUNT 9: DISTRICT OF COLUMBIA**
**VIOLATION OF DISTRICT OF COLUMBIA CODE §§ 28-4501, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in the District of Columbia)**

310. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

311. Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq*. Defendants' conspiracies had the following effects in the District of Columbia: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in the District of Columbia by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

312. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. Defendants' violations of District of Columbia law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under D.C. Code §§ 28-4501, *et seq*.

**COUNT 10: DISTRICT OF COLUMBIA**
**VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT,**
**D.C. CODE §§ 28-3901, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in the**
**District of Columbia)**

313. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

314. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code §§ 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 11: FLORIDA**
**VIOLATION OF**
**THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. §§ 501.201, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Florida)**

315. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

316. Defendants engaged in unfair methods of competition, entering into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' conspiracies had the following effects in Florida: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Florida b y paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce.

317. Defendants' violations of Florida law were flagrant and willful. Accordingly,

77

Plaintiffs and members of the State Law Class seek all forms of relief available under Fla. Stat. § 501.201, *et seq.*

### COUNT 12: HAWAII
### VIOLATION OF HAWAII ANTITRUST LAW,
### HAW. REV. STAT. ANN. §§ 480-1, *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Hawaii)**

318.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

319.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. Ann. § 480-1, *et seq.* Defendants' conspiracies had the following effects in Hawaii: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Hawaii by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. Defendants' violations of Hawaii law were flagrant and willful.

320.   Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq.*

### COUNT 13: ILLINOIS
### VIOLATION OF THE ILLINOIS ANTITRUST ACT,
### 740 ILL. COMP. STAT. §§ 10/1, *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Illinois)**

321.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

322.   Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.* Defendants' conspiracies had the following effects in Illinois: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Illinois by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

323. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. Defendants' violations of Illinois law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*

**COUNT 14: ILLINOIS**
**VIOLATION OF**
**THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,**
**815 ILL. COMP. STAT. ANN. §§ 505/1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Illinois)**

324. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

325. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq.*, and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 15: IOWA**
**VIOLATION OF THE IOWA COMPETITION LAW, IOWA CODE §§ 553.1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Iowa)**

326. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

327. Defendants have entered into an unlawful agreement in restraint of trade in

79

violation of the Iowa Competition Law, Iowa Code § 553.1, *et seq*. Defendants' conspiracies had the following effects in Iowa: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Iowa by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

328.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. Defendants' violations of Iowa law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Iowa Code § 553.1, *et seq*.

## COUNT 16: KANSAS
### VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT, KAN. STAT. ANN. §§ 50-101, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Kansas)

329.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

330.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq*. Defendants entered into arrangements, contracts, agreements, trust or combinations made with a view toward preventing or which tend to prevent full and free competition for the provision of Commodity Shell Eggs. Defendants' conspiracies had the following effects in Kansas: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs

80

and members of the State Law Class were injured in their business or property in Kansas by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

331.    Defendants' violations of Kansas law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Kan. Stat. Ann. §§ 50-101, *et seq.*

**COUNT 17: MAINE**
**VIOLATION OF THE MAINE ANTITRUST STATUTE,**
**ME. STAT. TIT. 10, §§ 1101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Maine)**

332.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

333.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq.* Defendants' conspiracies had the following effects in Maine: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Maine by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

334.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Defendants' violations of Maine law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq.*

## COUNT 18: MARYLAND
### VIOLATION OF THE MARYLAND ANTITRUST ACT,
### MD. CODE §§ 11-209(a), *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Maryland)

335. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

336. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-201, *et seq*.

Defendants' conspiracies had the following effects in Maryland: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Maryland by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

337. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. Defendants' violations of Maryland law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Md. Code Ann., Com. Law § 11-201, *et seq*.

## COUNT 19: MASSACHUSETTS
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION LAW,
### MASS. GEN. LAWS ANN. Ch. 93A §§ 1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Massachusetts)

338. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

339. Defendants have entered into an unlawful agreement in restraint of trade in

82

violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A § 1, *et seq*. Defendants' conspiracies had the following effects in Massachusetts: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Massachusetts by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce. Defendants' violations of Massachusetts law were flagrant and willful.

340.    Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Mass. Gen. Laws Ch. 93A § 1, *et seq*.

**COUNT 20: MICHIGAN**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,**
**MICH. COMP. LAWS §§ 445.771, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Michigan)**

341.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

342.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq*. Defendants' conspiracies had the following effects in Michigan: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Michigan by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

83

343. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Defendants' violations of Michigan law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Mich. Comp. Laws § 445.771, *et seq*.

## COUNT 21: MICHIGAN
### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS §§ 445.903, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Michigan)

344. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

345. Defendants have engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Michigan in violation of Michigan Compiled Laws §§ 445.903, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 22: MINNESOTA
### VIOLATION OF THE MINNESOTA ANTITRUST LAW, MINN. STAT. §§ 325D.49, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Minnesota)

346. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

347. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Antitrust Law, Minn. Stat. § 325D.49, *et seq*. Defendants' conspiracies had the following effects in Minnesota: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law

Class were injured in their business or property in Minnesota by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

348.   During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Defendants' violations of Minnesota law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Minn. Stat. § 325D.49, *et seq*.

## COUNT 23: MINNESOTA
## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. §§ 325D.43, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Minnesota)

349.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

350.   Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Minnesota Statutes §§ 325D.43-48, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 24: MISSISSIPPI
## VIOLATION OF THE MISSISSIPPI ANTITRUST LAW, MISS. CODE ANN. §§ 75-21-1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Mississippi)

351.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

352.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq*. Defendants' conspiracies had the following effects in Mississippi: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State

85

Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Mississippi by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

353. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Defendants' violations of Mississippi law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Miss. Code Ann. §§ 75-21-3, *et seq*.

## COUNT 25: MISSOURI
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. ANN. STAT. § 407.010, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Missouri)

354. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

355. Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

356. Plaintiffs and State Law Class members purchased Commodity Shell Eggs within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the price of these Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

357. Under Missouri law, indirect purchasers have standing to maintain an action under MMPA based on the facts alleged in this complaint.

358. Defendants contracted, combined, or conspired in restraint of trade or commerce of Commodity Shell Eggs within the intrastate commerce of Missouri, including through agreements to fix prices, allocate markets, or otherwise control trade, in violation of Mo. Ann. Stat. § 407.010,

*et seq.*

359. Plaintiffs and members of the State Law Classes were injured with respect to purchases of Commodity Shell Eggs in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount that bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorney's fees, costs, and injunctive relief.

<u>COUNT 26: MONTANA</u>
**VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT,
MONT. CODE ANN. §§ 30-14-101, *et seq.*
(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in
Montana)**

360. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

361. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Consumer Protection Act, Mont. Code Ann. §§ 30-14-101, *et seq*. Defendants' conspiracies had the following effects in Montana: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Montana by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

362. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce. Defendants' violations of Montana law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Mont. Code Ann. §§ 30-14-101, *et seq*.

## COUNT 27: NEBRASKA
**VIOLATION OF THE NEBRASKA JUNKIN ACT, NEB. REV. STAT. §§ 59-801, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Nebraska)**

363.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

364.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Junkin Act, Neb. Rev. Stat. §§ 59-801, *et seq*. Defendants' conspiracies had the following effects in Nebraska: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Nebraska by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

365.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Defendants' violations of Nebraska law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Neb. Rev. Stat. §§ 59-801, *et seq*.

## COUNT 28: NEBRASKA
**VIOLATION OF THE NEBRASKA DECEPTIVE TRADE PRACTICES ACT,**
**NEB. REV. STAT. §§ 59-1601, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Nebraska)**

366.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

367.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Revised Statutes §§ 59-1601, *et seq*., and, accordingly, Plaintiffs and

members of the State Law Class seek all relief available under that statute.

## COUNT 29: NEVADA
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,
### NEV. REV. STAT. §§ 598A, *et seq*.
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Nevada)**

368.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

369.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*. Defendants' conspiracies had the following effects in Nevada: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Nevada by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

370.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Defendants' violations of Nevada law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

## COUNT 30: NEVADA
### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,
### NEV. REV. STAT. §§ 598.0903, *et seq*.
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Nevada)**

371.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

372.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Nevada Revised Statutes Annotated §§ 598.0903, *et seq.*, and, accordingly,

89

Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 31: NEW HAMPSHIRE**
**VIOLATION OF THE NEW HAMPSHIRE ANTITRUST LAW,**
**N.H. REV. STAT. ANN. §§ 356:1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Hampshire)**

373. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

374. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Antitrust Statute, N.H. Rev. Stat. Ann. §§ 356:1, *et seq*. Defendants' conspiracies had the following effects in New Hampshire: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in New Hampshire by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

375. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Defendants' violations of New Hampshire law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.H. Rev. Stat. Ann. §§ 356:1, *et seq*.

**COUNT 32: NEW HAMPSHIRE**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. §§ 358-A:1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Hampshire)**

376. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

377. Defendants engaged in unfair competition or unfair or deceptive acts or practices

90

in violation of New Hampshire Revised Statutes Annotated §§ 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 33: NEW JERSEY
### VIOLATION OF THE NEW JERSEY ANTITRUST ACT,
### N.J. STAT. ANN. §§ 56:9-3, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Jersey)

378.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

379.    Defendants' conspiracy detrimentally affected the price competition for Commodity Shell Eggs purchased in the State of New Jersey by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Commodity Shell Eggs prices in the State of New Jersey at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Jersey commerce.

380.    Defendants engaged in a conspiracy in restraint of the trading of Commodity Shell Eggs in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3. Accordingly, Plaintiffs and members of the Class seek equitable relief and compensatory damages, together with reasonable attorneys' fees, filing fees and reasonable costs of suit, including but not limited to expenses of discovery and document reproduction. N.J. Stat. Ann. § 56:9-12.

## COUNT 34: NEW JERSEY
### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT,
### N.J. STAT. ANN. §§ 56:8-2, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Jersey)

381.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

382.    Defendants engaged in unfair competition or unfair or deceptive acts or practices

91

by conspiring to restrain trade in the State of New Jersey in violation of N.J. Stat. Ann. §§ 56-8-2, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

### COUNT 35: NEW MEXICO
### VIOLATION OF THE NEW MEXICO ANTITRUST LAW, N.M. STAT. ANN. §§ 57-1-1, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Mexico)

383. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

384. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq*. Defendants' conspiracies had the following effects in New Mexico: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in New Mexico by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

385. Defendants' violations of New Mexico law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.M. Stat. Ann. §§ 57-1-1, *et seq*.

### COUNT 36: NEW MEXICO
### VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-1, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New Mexico)

386. Plaintiffs incorporate by reference the allegations in the preceding paragraphs,

92

excluding causes of action.

387.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Statutes Annotated §§ 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 37: NEW YORK**
**VIOLATION OF THE DONNELLY ACT, N.Y. GEN. BUS. LAW §§ 340, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in New York)**

388.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

389.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq*. Defendants' conspiracies had the following effects in New York: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in New York by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

390.    The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. Defendants' violations of New York law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.Y. Gen. Bus. Law §§ 340, *et seq*.

93

## COUNT 38: NORTH CAROLINA
## VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. §§ 75-1, *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in North Carolina)**

391.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

392.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann.

393.    §§ 75-1, *et seq.* Defendants' conspiracies had the following effects in North Carolina: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in North Carolina by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

394.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Defendants' violations of North Carolina law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

## COUNT 39: NORTH DAKOTA
## VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES LAW, N.D. CENT. CODE §§ 51-10, *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in North Dakota)**

395.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

396.    Defendants have entered into an unlawful agreement in restraint of trade in violation

94

of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* Defendants' conspiracies had the following effects in North Dakota: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in North Dakota by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

397.    During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. Defendants' violations of North Dakota law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under N.D. Cent. Code §§ 51-08.1-01, *et seq.*

### COUNT 40: OREGON
### VIOLATION OF THE OREGON ANTITRUST LAW,
### OR. REV. STAT. §§ 646.725, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Oregon)

398.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

399.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.* Defendants' conspiracies had the following effects in Oregon: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Oregon by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

400.    During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. Defendants' violations of Oregon law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.*

## COUNT 41: OREGON
### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT, OR. REV. STAT. §§ 646.605, *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Oregon)**

401.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

402.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Revised Statutes §§ 646.605, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 42: PUERTO RICO
### VIOLATION OF THE PUERTO RICO ANTITRUST ACT, PR. LAWS ANN. TIT. 10, CH. 13, §§ 257, *et seq.*
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Puerto Rico)**

403.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

404.    Defendants' actions violated P.R. Laws Ann. tit. 10, ch. 13, §§ 258, *et seq.*, through their anticompetitive actions. Through their actions and the actions of co-conspirators, Commodity Shell Eggs prices in Puerto Rico were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and members of the State Law Class. Throughout the Class Period, price competition in the market for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Puerto Rico. Plaintiffs and members of the State Law Class, including those who resided in Puerto Rico and purchased Commodity Shell Eggs there, paid supra-competitive,

96

artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in Puerto Rico.

405. Defendants entered into an unlawful agreement in restraint of trade in violation of P.R. Laws Ann. tit. 10, ch. 13, § 258. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under P.R. Laws Ann. tit. 10, ch. 13, §§ 258, *et seq*.

**COUNT 43: RHODE ISLAND**
**VIOLATION OF THE RHODE ISLAND ANTITRUST LAW,**
**R.I. GEN. LAWS §§ 6-36-1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Rhode Island)**

406. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

407. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq*. The Rhode Island statute allows actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' conspiracies had the following effects in Rhode Island: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Rhode Island by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

408. During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce. Defendants' violations of Rhode Island law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under R.I. Gen. Laws §§ 6-36-1, *et seq*.

## COUNT 44: RHODE ISLAND
## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, R.I. GEN. LAWS §§ 6-13.1-1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Rhode Island)

409. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

410. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island General Laws § 6-13.1-1, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 45: SOUTH DAKOTA
## VIOLATION OF THE SOUTH DAKOTA ANTITRUST LAW, S.D. COD. LAWS §§ 37-1-3.1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in South Dakota)

411. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

412. Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.* Defendants' conspiracies had the following effects in South Dakota: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in South Dakota by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

413. During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce. Defendants' violations of South Dakota law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under

S.D. Codified Laws §§ 37-1-3.1, *et seq.*

## COUNT 46: SOUTH DAKOTA
## VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, S.D. COD. LAWS §§ 37-24-1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in South Dakota)

414.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

415.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Codified Laws §§ 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 47: TENNESSEE
## VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT, TENN. CODE ANN. §§ 47-25-101, *et seq.*
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Tennessee)

416.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

417.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* Defendants' conspiracies had the following effects in Tennessee: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Tennessee by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

During the Class Period, Defendants' illegal conduct substantially affected Tennessee

commerce. Defendants' violations of Tennessee law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*.

**COUNT 48: UTAH**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. §§ 76-10-3101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Utah)**

418.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

419.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq*. Defendants' conspiracies had the following effects in Utah: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Utah by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

420.    During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. Defendants' violations of Utah law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Utah Code Ann. §§ 76-10-3101, *et seq*.

**COUNT 49: VERMONT**
**VIOLATION OF THE VERMONT CONSUMER FRAUD ACT,**
**9 V.S.A. §§ 2451, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Vermont)**

421.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs,

100

excluding causes of action.

422.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Consumer Fraud Act, 9 Vermont Stat. Ann. §§ 2453, *et seq*. Defendants' conspiracies had the following effects in Vermont: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Vermont by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

423.    During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. Defendants' violations of Vermont law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under 9 Vermont Stat. Ann. §§ 2453, *et seq*.

**COUNT 50: VIRGINIA**
**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT,**
**VA. CODE ANN. §§ 59.1-196, et seq.**
**(On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Virginia)**

424.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

425.    Plaintiffs purchased Commodity Shell Eggs within the State of Virginia during the Class Period. But for Defendants' conduct set forth herein, the price of Commodity Shell Eggs would have been lower, in an amount to be determined at trial.

426.    By reason of the conduct alleged herein, Defendants have violated Va. Code Ann. §§ 59.1-196, *et seq*.

427.    Defendants entered into a contract, combination, or conspiracy between two or

more persons in restraint of, or to monopolize, trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within Virginia.

428.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Commodity Shell Eggs market, a substantial part of which occurred within Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Commodity Shell Eggs market.

429.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.

430.     Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

431.     Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

432.     Defendants' conduct was willful.

433.     As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the State Law Class have been injured in their business or property and are threatened with further injury.

434.     Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until January 1, 2022, Defendants concealed the existence of their unlawful conduct through their affirmative acts of misrepresentation with the intent to debar and deter the Plaintiffs and State Law Class from discovering the facts alleged giving rise to Defendants' unlawful conduct. The unlawful nature of Defendants' conduct is of character which involved moral turpitude. As a result, the time of Defendants' obstruction should not be counted as any part of the period within which the action must brought.

435. By reason of the foregoing, the Plaintiffs and the members of the State Law Class are entitled to seek all forms of relief, including treble damages or $1000 per violation, whichever is greater, plus reasonable attorneys' fees and costs under Va. Code Ann. §§ 59.1-204(A), *et seq*.

### COUNT 51: WEST VIRGINIA
### VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA. CODE §§ 47-18-1, *et seq*.
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in West Virginia)

436. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

437. Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq*. Defendants' conspiracies had the following effects in West Virginia: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in West Virginia by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

438. During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. Defendants' violations of West Virginia law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under W.Va. Code §§ 47-18-1, *et seq*.

### COUNT 52: WISCONSIN
### VIOLATION OF THE WISCONSIN ANTITRUST ACT, WIS. STAT. § 133.03
### (On Behalf of State Law Class Members that Purchased Commodity Shell Eggs in Wisconsin)

439. Plaintiffs incorporate by reference the allegations in the preceding paragraphs,

excluding causes of action.

440. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq*. Defendants' conspiracies had the following effects in Wisconsin: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated; (2) Commodity Shell Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the State Law Class were deprived of free and open competition; and (4) Plaintiffs and members of the State Law Class were injured in their business or property in Wisconsin by paying supracompetitive, artificially inflated prices for Commodity Shell Eggs.

441. During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. Defendants' violations of Wisconsin law were flagrant and willful. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Wis. Stat. §§ 133.01, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment as follows:

1) The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as the Class Representatives and their counsel of record as Class Counsel, and direct that at a practicable time notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes;

2) Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner

continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

3)      The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act, and a violation of each of the state law statutes alleged herein;

4)      Awarding Plaintiffs and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, multiple damages according to law against Defendants, jointly and severally;

5)      Awarding Plaintiffs and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

6)      Ordering Defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to Plaintiffs and Class Members;

7)      Plaintiffs and the Class Members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8)      Plaintiffs and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9)      Granting Plaintiffs and the Class Members such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: July 30, 2026

 */s/ Bobby Pouya*

Bobby Pouya (*pro hac vice*)
Daniel L. Warshaw (*pro hac vice*)
Naveed Abaie (*pro hac vice*)
Adrian J. Buonanoce (*pro hac vice*)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Tel. (818) 788-8300
bpouya@pwfirm.com
dwarshaw@pwfirm.com
nabaie@pwfirm.com
abuonanoce@pwfirm.com

Neil Swartzberg (*pro hac vice*)
555 Montgomery St., Suite 1205
San Francisco, CA 94111
**PEARSON WARSHAW, LLP**
Tel. (415) 433-9000
nswartzberg@pwfirm.com

Brian S. Pafundi (*pro hac vice*)
**PEARSON WARSHAW, LLP**
328 Barry Ave. South, Suite 200
Wayzata, MN 55391
Tel. (612) 389-0600
bpafundi@pwfirm.com

 */s/ Thomas H. Burt*

Thomas H. Burt
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
burt@whafh.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Betsy C. Manifold
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Tel: (619) 239-4599
Fax: (619) 234-4599
*manifold@whafh.com*

*Co-Lead Counsel for Indirect Consumer Purchasers*

 */s/ Brian J. Dunne*

Brian J. Dunne
Edward M. Grauman
Kaki J. Johnson
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel. (213) 462-4772
bdunne@bathaeedunne.com
egrauman@bathaeedunne.com
kjohnson@bathaeedunne.com

Yavar Bathaee
Andrew Wolinsky
**BATHAEE DUNNE LLP**
445 Park Ave, 9th Floor
New York, NY 10022
Phone: 332-208-7337
yavar@bathaeedunne.com
awolinsky@bathaeedunne.com

*Coordinating and Liaison Counsel for Indirect Consumer Purchasers*

107

Jesse J. Bair
Nathan M. Kuenzi
**BURNS BAIR LLP**
610 E. Doty Street, Suite 600
Madison, WI 53703
(608) 286-2302
jbair@burnsbair.com
nkuenzi@burnsbair.com

*Local Counsel for Indirect Consumer
Purchasers*

Robert J. Wozniak (*pro hac vice*)
Douglas A. Millen (*pro hac vice*)
**JUSTICE JAGHER LONDON
& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Tel: (224) 632-4500
Fax: (224) 632-4521
Email: rwozniak@jjlmlaw.com
Email: dmillen@jjlmlaw.com

Kimberly A. Justice (*pro hac vice*)
**JUSTICE JAGHER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (484) 243-6335
Fax: (224) 632-4521
Email: kjustice@jjlmlaw.com

Rex A. Sharp (*p.h.v. forthcoming*)
Hammons P. Hepner (*pro hac vice*)
Isaac L. Diel (*p.h.v. forthcoming*)
Sarah T. Bradshaw
Hans D. Hodes
**SHARP LAW, LLP**
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
hhepner@midwest-law.com
idiel@midwest-law.com
sbradshaw@midwest-law.com
hhodes@midwest-law.com

Blake Hunter Yagman
YAGMAN PLLC
1050 30th St. N.W.
Washington, D.C. 20007
Tel.: (929) 709-1493
Email: blake.yagman@yagmanpllc.com

*Steering Committee for Indirect Consumer
Purchasers*